ROB BONTA
Attorney General of California
KYLE A. LEWIS
Supervising Deputy Attorney General
ISHA VAZIRANI
Deputy Attorney General
State Bar No. 354914
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3478
  Fax:  (415) 703-5843
  E-mail:  Isha.Vazirani@doj.ca.gov
*Attorneys for Defendant*
*Sanchez*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **WHITE,**<br><br>Plaintiff,<br><br>v.<br><br>**SANCHEZ,**<br><br>Defendant. | 2:21-cv-04066-GW-DFM<br><br>**DECLARATION OF I. VAZIRANI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  The Honorable Douglas F. McCormick<br>Trial Date:  Not Set<br>Action Filed: 5/14/2021 |

I, I. Vazirani, declare:

1.     I am a Deputy Attorney General at the California Department of Justice and assigned counsel for Defendant in this matter.  I submit this declaration in support of Defendant's Motion for Summary Judgment.

2.     I took the deposition of James White (CDCR No. AI5074), the Plaintiff in this case, remotely on July 24, 2025.  A true and correct copy of the relevant portions of the deposition transcript is attached as **Exhibit A**.

3.     Relevant portions of the 2025 California Department of Corrections and Rehabilitation Department Operations Manual are attached as **Exhibit B**.  This

1

documents is publicly available at https://www.cdcr.ca.gov/regulations/cdcr-regulations/dom-toc/.

4.    A true and correct copy of a CDCR Property Search/Receipt Notice dated May 8, 2020 is attached as **Exhibit C**.

5.    True and correct copies of Plaintiff's CDCR 1083 Inmate Property Inventory forms are attached as **Exhibit D**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of May, 2026.

*/s/ Isha Vazirani*
Isha Vazirani

LA2022401620
45099106.docx

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

WHITE,                          )
                                )
            Plaintiff,          )
                                ) Case No.: 2:21-cv-04066 GW (DFM)
                                )
vs.                             )
                                )
SANCHEZ,                        )
                                )
            Defendant.          ) (Pages 1-51)
_____  )

VIDEOCONFERENCE DEPOSITION OF

PEDRO JAMES EVERETT WHITE, SR.

Thursday, July 24, 2025

9:00 a.m. PDT

Reported by: John Fahrenwald,  CA CSR 14369, RPR

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

WHITE,                          )
                                )
            Plaintiff,          )
                                ) Case No.: 2:21-cv-04066 GW (DFM)
                                )
vs.                             )
                                )
SANCHEZ,                        )
                                )
            Defendant.          )
_____)

          Videoconference Deposition of Deponent PEDRO JAMES

EVERETT WHITE, SR, taken on behalf of the Defendant,

commencing at 9:00 a.m., PDT, July 24, 2025, before Reporter

John Fahrenwald, Certified Shorthand Reporter for the State

of California, CSR No. 14369, RPR.

APPEARANCES:


FOR THE PLAINTIFF:

          BY:  PEDRO JAMES EVERETT WHITE, SR., Pro Se




FOR THE DEFENDANT SANCHEZ:


          BY: ISHA VAZIRANI, ESQ.

               Deputy Attorney General

               455 Golden Gate Avenue, Suite 11000

               San Francisco, CA 94102-7004

               Telephone: (415) 510-3478

               Fax: (415) 703-5843

               E-mail: Isha.Vazirani@doj.ca.gov

INDEX


DEPONENT                                                        PAGE

PEDRO JAMES EVERETT WHITE, SR

Examination by MS. VAZIRANI                                        5


                              EXHIBITS

                    (No exhibits were marked.)

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

A. No, ma'am.

Q. Okay.  And on May 8th, 2020, when you had an interaction with defendant Sanchez, was anyone else present for that interaction?

A. No, ma'am.

Q. Other than those two dates, did you have any interactions with defendant Sanchez?

A. No, ma'am.

Q. Did you see him again after May 8th, 2020?

A. I don't believe I did, no.

Q. Did you ever speak to him after that?

A. No, ma'am.

Q. You have never spoken to him after that. Correct?

A. That is correct.

Q. And can you remind me again, why did you file this lawsuit against the defendant?

A. Because he illegally destroyed my property.

Q. Did you -- do you know when he destroyed your property?

A. No, ma'am.

Q. Do you know how he destroyed your property?

A. No, ma'am.

Q. Did you -- just so that I'm clear, see him destroy your property?

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Pedro James Everett White, Sr. (AI5074)                    7/24/2025
Case 2:21-cv-04066-GW-DFM    Document 97-4    Filed 05/29/26    Page 9 of 37    Page ID
#:869

Page 30

A. No, ma'am.

Q. So why do you think he destroyed your property, just so that I understand it?

A. Because his name is signed on this 1083 that he consolidated my property.  If he consolidated my property, he's supposed to either give me a chance, according to the title 15, to either donate my property or send it home.  He never gave me that chance and he was the last one to have my property. So he's responsible for my property.

Q. And in your fourth amended complaint, which is the operative complaint, you claimed that the defendant retaliated against you in violation of the First Amendment; is that correct?

A. Yes, ma'am.

Q. Why would the defendant retaliate against you?

A. Since he had nepotism and I think they all work together.  Because I filed the first 602 against the officer and from then on, I was starting to get retaliated against.

Q. When did that start up?

A. December 24th, 2019, thereafter.

Q. You said you filed a first 602 and then retaliation started?

A. Yes, ma'am.

Q. When did you file that 602?

A. December 24th, 2019.



Q. Did you know him before December 24th, 2019?

A. Yes, ma'am. He was a floor officer in the building.

Q. So would you say -- so how often did you interact with him before that?

A. Maybe four to five days a week.

Q. Did you see or interact with Urias after December 24th, 2019?

A. Yes, ma'am.

Q. In what capacity?

A. He was the floor officer in my building.  He was like a regular officer in the building.

Q. What were your interactions with Urias typically like?

A. What was they like?

Q. Yeah.

A. Not good.

Q. How were they not good?

A. Because he was always harassing me, searching my cell, doing stuff, trying to get up under my skin, I would say.

Q. Are there any other ways in which Mr. Urias was harassing you, as you said?

A. No, ma'am.

Q. Do you know if defendant Sanchez knows

 TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Mr. Urias?

A. No, ma'am. I don't know that.

Q. Okay. And if your complaint you mentioned a Reyes-Cortez; is that correct?

A. Yes, ma'am.

Q. Who is Reyes-Cortez?

A. She was an officer in the building.

Q. When did you first interact with Reyes-Cortez?

A. I want to say 2017.

Q. And in what capacity?

A. She was a regular officer in the building.

Q. What were your interactions with Reyes-Cortez typically like?

A. In the beginning, it was just, you know, hi and bye. You know, she's doing her job and I'm doing time.

Q. That was in the beginning. What happened after?

A. It didn't happen until December 24th, 2019, when she put the handcuffs on me and left me in the cage for two hours with the handcuffs on. Excessive. And I filed the complaint.

Q. Did you file any grievances against Reyes-Cortez?

A. Yes, ma'am.

Q. And what was the outcome?

A. Well, the outcome of the 602, they denied it,


TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

and now I'm on a lawsuit for excessive force.

Q. What's the name of that lawsuit?

A. People v. Castillo. I mean, White v. Castillo. My bad, my bad.

Q. Okay. And is that lawsuit pending?

A. Yes, ma'am.

Q. Do you know if the defendant -- if defendant Sanchez knows Reyes-Cortez?

A. I believe so.

Q. Why do you?

A. That's my opinion.  Because all the officers are pretty much stick together.

Q. Do you have any other information about how they know each other?

A. No, ma'am.

Q. Have you seen them interact with each other?

A. I've seen them talk before.

Q. When?

A. Specific date?

Q. If you don't know the specific date, that's fine.

A. I don't know the specific date, but just on the yard, just -- you know.

Q. Do you know anything else about how they know each other?



Pedro James Everett White, Sr. (AI5074)  7/24/2025
Case 2:21-cv-04066-GW-DFM    Document 97-4    Filed 05/29/26    Page 13 of 37    Page
ID #:873

Page 36

A. No, ma'am.

Q. Do you recall anything else about Officer Reyes-Cortez?

A. No, ma'am.

Q. And in your complaint, you mentioned someone named Priam; is that correct?

A. Say that again?

Q. Someone named Priam in your complaint?

A. Cryum (sic)?

Q. Priam, P-R-I-A-M.

A. I don't recall right now.

Q. Okay.

Q. Do you recall someone named Monterra named in your complaint?

A. Yes, ma'am.

Q. Okay. How do you know Monterra?

A. He was a part of the retaliation team against me.

Q. Who is Monterra?

A. He was a like a yard officer, like I don't know his -- it probably was a discipline officer, like if you get an RVR, he'd come to your cell and pass you the papers for something like that. But he used to stand on the yard and monitor the yard.

Q. And what were your interactions with him?

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

A. Always confrontational.

Q. How so?

A. He's always harassing me, wanting to search me. And that's why I filed multiple complaints against him.

Q. How many complaints did you file against him?

A. Maybe two or three.

Q. What were those complaints for?

A. One was excessive force, illegal searching, those -- just the harassment on a daily basis.

Q. Why do you think Monterra was retaliating against you?

A. My opinion, I think it's all after December 4th, 2019, 602 against the two officers.

Q. Do you know anything else about why he might retaliate against you?

A. No.  I can't get into his head why he did it, but he was just doing it.

Q. Do you know if defendant Sanchez knows Monterra?

A. Oh, yes. Yes, ma'am.

Q. How do you know that?

A. Because they -- they yard officers they have to monitor the yard.

Q. Have you seen them interact with each other?

A. Not personally, no.



Q. Do you know anything else about how they might know each other?

A. No, ma'am.

Q. Do you recall anything else about Monterra?

A. No, ma'am.

Q. And in your complete you mentioned someone named Scott; is that correct?

A. Yes, ma'am.

Q. Who is Scott?

A. He was one of the officers in the chow hall on 14/20 assaulting another inmate.

Q. Did you any interactions with Scott before this?

A. Not interactions, no.

Q. Did you know of him before that date?

A. Yes, ma'am.  He worked in the chow hall.

Q. So had you seen him before that date?

A. Yes, ma'am.

Q. Would you say that you'd seen him pretty regularly before that date?

A. Yes, ma'am.

Q. What -- and you said you didn't -- sorry, let me -- strike that.

Did you speak with him before that date?

A. No. No, ma'am.

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Q. Have you ever spoken to Scott?

A. Yes, ma'am.

Q. When?

A. Just being cordial.  He speak, I speak, and that's it.

Q. Was that after April 10th, 2020?

A. No, ma'am, before.

Q. Okay.

A. Yes, ma'am.

Q. Do you recall anything that you talked about?

A. No.  We never talked. Just hi, you say hi, it's cordial.

Q. Okay. Nothing -- no major conversations or anything.  Correct?

A. No, ma'am.

Q. And what was your interaction with him on 4/10/2020?

A. Well, I saw him and three other officers assault an inmate in the chow hall and I thought that was wrong.  So I filed -- go ahead?

Q. No, go ahead.

A. So I filed a complaint with the Public Defendant s Office in San Luis Obispo.

Q. Did you do anything when you saw him and other officers assaulting an inmate?

TP.One
Court Reporting
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

A. No, ma'am.

Q. Do you know if defendant Sanchez knows Scott?

A. I wouldn t say that I would know that, but that same day, they worked together.  So on that same day, that's the same day that I went to the hole for that incident.

Q. Do you know anything else about the relationship between defendant Sanchez and Scott?

A. No, ma'am.

Q. Do you have any other additional information about that?

A. No, ma'am.

Q. You said that there was retaliation against you after December 24th, 2019; is that correct?

A. Yes, ma'am.

Q. And that was retaliation by numerous staff members?

A. That is correct.

Q. When -- did that retaliation stop?

A. It stopped when I came over here.

Q. Okay.

A. Because I'm not in that prison no more.

Q. Just to clarify, it stopped when you were transferred to another prison?

A. That is correct.

Q. Okay.  After you were released from ad seg at



CMC, where were you housed?

A. On C yard, I want to say the second tier. I don't really -- I don t remember the exact cell, so.

Q. And do you recall -- go ahead?

A. No, you go, ma'am.

Q. Okay.  Do you recall where you were housed before being transferred to ad seg at CMC?

A. Yeah. 6 building, 6159.

Q. Just to be clear, were those different units?

A. No, it's the same. It just have three floor.

Q. So your cell was different?

A. Yes, ma'am.

Q. Okay. After you were released from ad seg, did you have any interactions with defendant Sanchez?

A. No, ma'am.

Q. Did you have any interaction with Urias?

A. No, ma'am.

Q. Did you have any interactions with Reyes-Cortez?

A. No, ma'am.

Q. Did you have any interactions with Monterra?

A. No, ma'am.

Q. Did you have any interactions with Scott?

A. No, ma'am.

Q. Do you have any witnesses that support your

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

claims against defendant Sanchez?

A. The witnesses is the paperwork.

Q. Which paperwork?

A. When he consolidated my property, the 1083 and property receipts, the cell search receipts.

Q. Do you have any other witnesses to support your claims against defendant Sanchez?

A. No, ma'am.

Q. And do you have any documents that support your complaints against defendant Sanchez?

A. Yes, ma'am.

Q. What documents do you have?

A. I have the 1083 form and the cell search receipts that he signed -- that said he took my property.

Q. Do you have any other documents to support your claims against defendant Sanchez?

A. No, ma'am.

Q. Were you injured as a result of defendant Sanchez's conduct?

A. Yeah.  I lost my lawsuit that way, if you want to say injury that way, he took all of my paperwork.

Q. Can you tell me more about why you lost your lawsuit because of defendant's conduct?

A. I couldn't file the paperwork in time.  So I couldn't meet the deadline because I didn't have the


TP.One
Court Reporting
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

boxes and three bags.

Q. Okay. And how did defendant Sanchez cause your property to be destroyed?

A. He was responsible for my property when he took it. And when I got out of the hole, all my property was not there.

Q. Okay.

A. That's why I'm talking to you today.

Q. Okay.  Do you know anything else about how he caused your property to be destroyed?

A. No.

Q. Okay.  Other than what we've discussed today, do you think there's anything else that's relevant to this case that I haven't asked you about that you want to talk about?

A. No, ma'am.

Q. Okay.  Is there any information that you want to add to any of your answers to my questions today?

A. No.  Not other than he was supposed to give me an opportunity to send my property home or put it in R&R. He didn't give me that opportunity.

Q. One second.  Let me review my notes very quickly.

Did you speak with anyone else about the property that was taken from yourself when you were in ad seg?



# EXHIBIT B

**Family Visiting Food Menu**

Each institution shall maintain a family-visiting menu from which to choose. The family visiting menu shall provide the following food items:

- Minimum of five, maximum of ten, breakfast entrees.
- Minimum of five, maximum of ten, lunch entrees.
- Minimum of five, maximum of ten, dinner entrees.
- Beverages, including bottled water, milk, and soda.
- Fresh fruit.
- Maximum of ten miscellaneous items.

Visitors with infants may be allowed the following items:

- Powdered or bottled formula in vendor-sealed containers.
- Baby food in vendor-sealed jars.

**Medically Prescribed Diets**

Visitors shall be allowed to bring medically prescribed food items to a family visit under the following conditions:

- The visitor shall provide a physician's statement to the family visiting coordinator, which includes a description of the diet, and describes why the diet must be continued during the visit.
- All food items must be vendor-sealed with recognizable labels.

If an incarcerated person is being supplied a nourishment bag and/or food supplements ordered by a physician or dentist, the incarcerated person shall be provided with the prescribed dietary additions during the visit.

**Funds for FVP Meals**

Incarcerated persons shall submit a completed FVP menu form with a CDCR Form 193, Trust Account Withdraw Order, authorizing a charge to the incarcerated person's trust account, to the family visiting coordinator at least three weeks prior to the visit.

At least two weeks prior to the visit, a copy of CDCR Form 193 shall be delivered to the trust office by the family visiting coordinator. If sufficient funds are not available in the incarcerated person's trust account, the family visiting coordinator shall inform the incarcerated person that the scheduled visit has been canceled.

Funds sent to an incarcerated person's trust account specifically designated for family visit food item and accompanied by a completed, signed CDC Form 1839, Exemption of Family Visit/Temporary Community Leave Funds from Restitution Fines/Orders, shall be exempt from restitution fines or orders.

**Processing of Food Order**

On the day of the visit, the family visiting coordinator shall facilitate the delivery of the food order to the visiting units at the commencement of the visit.

**Unclaimed Food Items**

If a family visit is canceled due to institution operations after the purchase of a food order, the incarcerated person may request reimbursement to their trust account for the amount of the food order.

Reimbursement of trust account funds shall be limited to family visit cancellations due to institutional actions such as:

- Suspension of the FVP due to institution emergency.
- A disciplinary hearing finding of not guilty after a charge of misconduct which restricted family visiting privileges.

Such reimbursement is subject to the provisions of DOM Chapter 5, Article 53, Section 54100, and applicable Victim Compensation and Government Claims Board rules.

If the family visit is canceled due to the actions of the incarcerated person and the incarcerated person has been charged for the food, the institution/shall allow person(s) designated by the incarcerated person to claim the food within 72 hours of the cancellation.

The final disposition of food remaining unclaimed after 72 hours shall be the responsibility of the institution.

### 54020.33.17  Family Visitor Medication

Medication shall be retained in a secure location by designated staff. Verification of the need to possess medication shall be provided by a physician's statement.

Visitors may retain only life-sustaining, condition-stabilizing medication with the prescribing physician's written statement of its immediate need, and only in the physician's prescribed amount immediately required to sustain or stabilize the condition during the visit. Female visitors may retain their birth control pills.

Other required medications shall be distributed to the visitor at prescribed times by staff designated by the institution.

Any unauthorized items may be secured in a visiting locker and retrieved at the conclusion of the visit.

### 54020.33.18  Family Visiting Count Procedures

Incarcerated persons in the family visiting quarters shall present themselves for count in accordance with institutional procedures. A minimum of four counts per 24-hour period shall be conducted.

Incarcerated persons who fail to present themselves for count are subject to disciplinary action and termination of the family visit.

### 54020.33.19  Unscheduled Inspection/Search of Family Visiting Units

Every effort shall be made to ensure the privacy of the incarcerated person and their visitor(s). However, the safety of persons and security of the institution may require the inspection and/or search of a family visiting unit while a visit is in progress.

The watch commander has the authority to order a search/inspection when the need arises. The watch commander and/or visiting supervisor shall be responsible to ensure that the search/inspection is conducted in a courteous and professional manner.

### 54020.33.20  Condition and Cleanliness of Family Visiting Units

Each incarcerated person shall be responsible for the care and cleanliness of the family visiting unit during a visit.

Before and after each family visit, the family visiting coordinator and each incarcerated person scheduled to visit, shall conduct a detailed inspection of their assigned unit to verify the unit's condition, cleanliness, and contents. A CDC Form 1069, Family Visiting Inventory, shall be completed by the family visiting coordinator.

Each incarcerated person shall be subject to disciplinary action, which may include suspension from participation in the FVP, for any willful damage of the unit and/or furnishings or for failure to maintain the cleanliness of the FVP unit. Incarcerated persons and/or visitors may be excluded from the FVP for willful damage of the family visiting unit. Prior to each family visit, the incarcerated person shall submit a completed CDCR Form 193.

Each family visiting unit shall be thoroughly cleaned by the occupants prior to the conclusion of each visit. Cleaning materials and equipment shall be provided by the institution.

### 54020.34  Appeals Related to Visiting

*Revised May 10, 2010*

Visitors who wish to discuss visiting-related issues are encouraged to contact the visiting supervisor for resolution. Interviews shall be conducted or scheduled at the earliest opportunity. Visitors and/or incarcerated persons may register complaints/appeals regarding visiting through procedures contained in CCR Section 3179 and DOM Chapter 5, Article 53.

### 54020.35  Transfer of Visiting Records

*Revised April 3, 2014*

The incarcerated person's visiting file shall be forwarded in accordance with DOM Chapter 7, Article 3.

### 54020.36  Revisions

The Director, Division of Adult Institutions, or designee shall ensure that this Article is accurate and current.

### 54020.37  References

*Revised January 4, 2006*

PC § 2601.

CCR (15) (3), §§ 3000; 3002(a)(2); 3044(c), (d), (e), (f), (g), and (h); 3045 and 3045.1; 3170 through 3178; 3190(a) and (h)(4); 3213 (a)(2) and (3)(c); 3343; and 3383(b)(3).

ACA Standards 4-4498 through 4-4504.

## Article 43 — Incarcerated Person Property

*Revised March 16, 2020*

### 54030.1  Policy

(a) Incarcerated persons shall be permitted to possess in their quarters or living areas, state-issued and authorized personal property as established in the

Authorized Personal Property Schedule (APPS), located in Appendix A; the Religious Personal Property Matrix (RPPM), located in Appendix B; the Non Disciplinary Segregation Personal Property Matrix (NDSPPM), located in Appendix D; and the Transgender Incarcerated persons Authorized Personal Property Schedule (TIAPPS), located in Appendix E; and based upon criteria delineated in Subsection 54030.7. The APPS, RPPM, NDSPPM and TIAPPS are the primary references for allowable incarcerated person property and identify limitations to the number of items allowed, dimension restrictions, if applicable, cost and value limitations, etc. The APPS, RPPM, NDSPPM and TIAPPS standardize allowable incarcerated person property Department-wide based upon assigned Privilege Group, assigned security level, institution mission, constitutional and legal mandates, and gender considerations. Any requests to add or delete items from the APPS, RPPM, NDSPPM and TIAPPS shall be forwarded to the Deputy Director, Division of Adult Institutions (DAI), for review and approval prior to implementation. Approved departmental modifications shall be reflected in the institution's local Operational Procedure regarding Incarcerated person Property. The possession of personal property is a privilege and is subject to conditions and restrictions established in California Code of Regulations (CCR), Title 15 Sections 3044, 3314, and 3315.

(b) Incarcerated persons may not exchange, borrow, loan, give away, sell or convey personal property to or from other incarcerated persons.

(c) *Note*: As a result of the standardization of allowable incarcerated person property, some items are no longer permissible based on the APPS, RPPM, NDSPPM and TIAPPS. Non-clear case appliances currently possessed by incarcerated persons shall be allowed to be retained until no longer operational. Incarcerated persons shall be allowed to retain other items of personal property that are no longer authorized until either transferred or for a period of up to one year after which time they will be considered disapproved property and disposed of per Subsection 54030.12.2, Processing Disapproved Property.

(d) The APPS, RPPM, NDSPPM and TIAPPS can be accessed at the following links:

(1) Authorized Personal Property Schedule (APPS)

(2) Religious Personal Property Matrix (RPPM)

(3) Non Disciplinary Segregation Personal Property Matrix (NDSPPM)

(4) Transgender Incarcerated Person's Authorized Personal Property Schedule (TIAPPS)

## 54030.2    Purpose

This Article establishes incarcerated person personal property volume limits; describes the forms necessary for the processing of property; establishes liability and methods of acquisition of personal and religious property; lists approval criteria, and describes the approval process for vendors; provides for acquisition of religious items, and the disposal of contraband; establishes protocols for the handling of incarcerated person personal property during transfer, extradition, escape, discharge, and upon death in custody. This Article also establishes a standardized list of allowable personal property items in the form of the APPS, based upon privilege group, and/or assigned security level, and/or institution mission, and a method for institutions to obtain exemptions to the standardized list.

## 54030.3    Responsibility

(a) The institution head shall administer this policy within their respective institutions or facilities.

**(b) Associate Warden Operations**

The Associate Warden, Operations, shall implement and monitor the operation of this procedure.

## 54030.4    Volume

The combined volume of state-issued and authorized personal property shall not exceed six cubic feet, except as specifically allowed in Subsection 54030.10.

## 54030.5    Property Documentation

*Revised October 15, 2024*

Departmental employees involved in the handling of an incarcerated person's property shall document such involvement in the Strategic Oversight Management System (SOMS) Personal Property Module. In the event SOMS is unavailable, documentation shall be completed on the following CDCR forms as appropriate:

(a) CDCR Form 104, Property and Cash Receipt-Arrival: A CDCR Form 104 shall be completed by Reception Center staff upon receipt of new arrivals. The CDCR Form 104 is used to document an incarcerated person's cash, personal securities, and property, and is used to document the proper disposition of unissued property and incarcerated person funds.

(b) CDC Form 143, Property Transfer Receipt: A CDC Form 143 shall be completed to document the number of containers and boxes of personal property an incarcerated person is transferring with and the progress of containers and boxes in transit. The CDC Form 143 may be used to identify multiple incarcerated persons with multiple containers and boxes of property (Bill of Lading).

(c) CDC Form 160-H, Incarcerated Person Property Control Card: A CDC Form 160-H shall be completed to maintain a record of all registerable property and its value. The CDC Form 160-H provides accountability to discourage theft and bartering of property of significant value or security interest (e.g., television, radio, handicraft tools, etc.).

(d) CDCR Form 1083, Incarcerated Person Property Inventory: A CDCR Form 1083 shall be completed when there is a need to inventory an incarcerated person's property (e.g., Restricted Housing Unit (RHU) placement, inter-institutional transfer, Out-to-Medical, Out-to-Court, extradition, property control, etc.), to ensure all property is accounted for and to provide a vehicle for the evaluation of incarcerated person property claims. The CDCR Form 1083 is the only acceptable document for this purpose.

## 54030.6    Liability

*Revised May 17, 2023*

(a) The Department does not accept liability for the theft, loss, damage, or destruction of incarcerated person personal property resulting from the intentional or careless act or activities or riotous behavior of any incarcerated person(s). The Department does not accept liability for the theft, loss, damage, or destruction of personal property in the incarcerated person's possession or control at the time of any willful act by the incarcerated person, such as escape, which exposes such property to loss or theft before it can be recovered and controlled by staff.

(b) Correctional staff shall assume responsibility for an incarcerated person's property upon notice that an incarcerated person is being retained elsewhere by taking control of that incarcerated person's property. If the property cannot be secured, as in a double occupied cell or dormitory, the property shall be removed and stored in a secured area.

(c) Upon notification of the incarcerated person being retained elsewhere, but within 24 hours, the incarcerated person's property shall be inventoried, packaged for transfer, and placed in a secure area. A copy of the SOMS automated form ISST200, Property Inventory, signed by the person who inventoried the property, shall be furnished to the incarcerated person.

(d) The Department shall accept liability for the loss or destruction of incarcerated person personal property when it is established that such loss or destruction results from employee action. Incarcerated persons shall utilize the incarcerated person grievance and appeal process if unable to resolve a personal property claim with staff pursuant to Subsection 54100.1. If the issue involves a prescribed health care appliance belonging to an incarcerated person with a documented disability, the incarcerated person may utilize the CDCR Form 1824, Reasonable Accommodation Request, to attempt to resolve the issue. Upon acceptance of liability, staff shall provide similar items of equal or greater value to the incarcerated person when such items are available via donated property items consistent with Subsection 54100.23.4, Granted Property Appeals. If donated items are not available, monetary compensation to the incarcerated person for such loss shall not exceed either:

(1) The dollar value as documented on SOMS automated form ISSS051B, Registerable Property Items.

(2) The cost of the item for which they have a receipt.

(3) The replacement value of a similar item as determined by a custody supervisor. Staff recommendations to the California Department of General Services Government Claims Program regarding monetary reimbursement are made accordingly.

(e) The Department shall not assume responsibility for property abandoned by an escapee. Staff shall inventory the property as specified in these policies and provide secure storage. The final disposition of the escapee's property shall be processed in accordance with California Penal Code Sections 5062 and 5063.

## 54030.7    Incarcerated Person Personal Property Acquisition

*Revised October 15, 2024*

(a) Incarcerated person personal property shall not be accepted at the front entrance gate or visiting desks. Incarcerated persons may be allowed to acquire specific items of personal property through the following methods:

**(1) Special Purchases**

(A) Facilities shall allow for incarcerated persons to purchase the below listed items utilizing funds in their incarcerated person trust account. Special purchases of the below listed items shall not be counted as a personal property package. Special purchases shall be from departmentally approved, special purchase vendors. Special purchases shall be made in accordance with approved local procedure.

(B) Facilities may submit for departmental approval, local special purchase vendors as required, to provide handicraft material, health care appliances, subscriptions to local newspapers, etc. The facility requesting departmental approval of a special purchase vendor shall submit the approval request to the office of the Deputy Director, DAI, along with rationale for approval and a statement that the vendor meets the local facility's security and business requirements.

(C) *Note*: The approval criteria for personal property package vendors established in Subsection 54030.9.1 does not apply to special purchase vendors. The approval criteria for religious personal property vendors is established in Subsection 54030.9.3.

(b) The amount charged an incarcerated person for ordering entertainment appliances, a musical instrument, handicraft material, periodicals, or fiction books as a special purchase shall include a 10 percent service charge. Service charges shall be deposited in the inmate welfare fund.

(c) Special purchases of health care appliances, correspondence courses, nonfiction books, and legal materials are not subject to service charges.

(d) Facilities will make available to all incarcerated persons, procedures for special purchases. Purchases of health care appliances, correspondence courses, religious items, and handicraft material require an incarcerated person to obtain prior written approval.

**(e) Health Care Appliances** are prescribed by health care staff and subject to approval by designated custody staff. Health care appliances may be purchased by third parties. All health care appliances are to be received by designated health care staff from an approved vendor and inspected by designated custody staff prior to issuance. Health care appliances are not subject to the six cubic foot property limitation and do not count towards the two appliance limit as described in Subsection 54030.7 (refer to Subsection 54030.11).

**(f) Correspondence Courses** and materials are subject to approval by designated custody and educational staff. Correspondence courses shall be received by designated education staff and inspected by designated custody staff prior to issuance (refer to Subsection 54030.10.3).

**(g) Legal Material** is legal reference materials and books, legal pads, and pencils not available in the institution canteen. Legal material purchases are to be received by Receiving and Release (R&R) staff and inspected prior to issuance (refer to Subsection 54030.10.2).

**(h) Religious Items**, as described in the RPPM. Incarcerated persons shall be authorized to order religious personal property based upon assigned Privilege Group as specified in the RPPM. Religious personal property items shall be ordered by incarcerated persons or third parties via a departmentally approved religious vendor.

**(i) Religious items** as described in the RPPM are to be shipped directly from a departmentally approved religious vendor in vendor sealed packages and inspected by designated custody staff prior to issuance (refer to CCR, Title 15, Subsection 3134(c)).

**(j) Entertainment Appliances and Musical Instruments**, as described in the APPS are to be shipped directly from a departmentally approved vendor in factory sealed packages, received by R&R staff, and inspected prior to issuance. Packages that are damaged or opened shall be refused (Subsection 54030.10.6).

**(k) Books and Periodicals**, purchases and subscriptions shall be submitted according to local procedures and may be purchased for an incarcerated person by a third party. (*Note:* For purposes of this subsection a departmentally approved vendor is any publisher or book store that does mail order business as outlined in CCR, Title 15, Subsection 3190(k)(7)).

**(l) Handicraft Material**, restricted to incarcerated persons approved to participate in the handicraft program. Handicraft items shall be received by the handicraft manager and inspected by designated custody staff prior to issuance (Subsection 54030.10.4).

**54030.7.1   Personal Property Packages**

*Revised October 15, 2024*

(a) Incarcerated persons may receive personal property based upon assigned privilege group as specified in Subsection 54030.8. Items of authorized property shall be limited to the items and categories listed in the APPS contained in Appendix A. Personal property packages shall be ordered by incarcerated persons or third parties via a departmentally approved vendor. A departmentally approved vendor may be chosen by an incarcerated person or third party to provide items for inclusion into a personal property package. While no more than one vendor may be used per package, incarcerated persons and their correspondents will be able to choose a different vendor for subsequent personal property package purchases. Personal property packages are limited to a 30 pound maximum weight limit and maximum dimensions of 24" x 24" x 24".

(b) Institution head or designees are authorized to utilize non-departmentally approved vendors for purchases of personal property packages to meet specific incarcerated person religious dietary needs. All religious food items shall be consistent with the criteria and categories established in the APPS located in Appendix A. The receipt of a personal property package from a religious specialty vendor shall count as a regular personal property package.

(c) Individual purchases of entertainment appliances and musical instruments by incarcerated persons using funds in their trust account or by third party shall not be counted as a personal property package unless additional items of personal property are also included.

(d) Quarterly personal property packages may be received by incarcerated persons at any time during a quarterly period. Upon arrival of a package at an institution, designated staff shall verify the eligibility of the incarcerated person to receive the package before issuance. Prior approval is not necessary as the arrival date of a package at an institution shall be the basis for the eligibility determination.

(e) Facilities will make available to all incarcerated persons, procedures for the receipt of packages from approved vendors in accordance with limits set for their assigned privilege group. Facilities are responsible for ensuring that current vendor catalogs and order forms are available in the incarcerated person library and visiting room.

(f) When a package is received at a facility with an address insufficient to locate the incarcerated person, staff shall exhaust all avenues of information in locating the incarcerated person before returning the package to the sender including, but not limited to, determining whether the incarcerated person is Out-to-Court, Out-to-Medical, transferred to another institution, jurisdiction, or parole.

(g) Issuance of incarcerated person packages shall be as soon as possible, but not later than 15 calendar days from delivery to the institution, except during the holiday season and during modified programs of affected incarcerated persons. For purposes of this Article, the holiday season is designated as beginning on November 15 and ending on January 15.

(h) Institutions may temporarily suspend delivery of incarcerated person packages to all portions of the institution during emergency lockdowns.

(i) Upon resumption of normal operations, incarcerated persons who are released from modified program status, housed in an institution experiencing a modified program, shall continue to receive packages within 15 calendar days.

(j) Issuance of packages to incarcerated persons affected by modified program status may be temporarily suspended for up to 90 calendar days (one quarter). After 90 days, issuance of previously stored packages is mandatory. A modified program status shall not result in the loss of a quarterly package.

(k) Packages received for incarcerated persons who are on modified program status may be temporarily stored in appropriate locations designated by the institution. The institution is responsible for identifying and designating adequate storage space, including emergency overflow storage as required, until such time as staff are able to issue packages.

(l) Incarcerated persons previously affected by modified programs shall receive unissued incarcerated person packages within 15 days after their release from modified program status.

(m) Institutions shall not instruct vendors to stop shipment of packages unless authorized by the Deputy Director, DAI. Upon receiving authorization from the Deputy Director, DAI, the institution shall be responsible for notification of the incarcerated person population. The incarcerated persons shall be responsible for notification of family or other correspondents.

(n) Packages shall not be returned based solely on the existence of a modified program.

**54030.7.2   Service Charge**

The amount charged an incarcerated person for a self-purchased personal property package order shall include normal taxes and a 10 percent service charge. Service charges shall be deposited in the inmate welfare fund. This service charge is exclusive of such costs as state sales tax, freight, and handling. Personal property packages sent from third parties via approved vendor shall not be subject to any service charge.

### 54030.8  Personal Property Package Criteria

*Revised October 15, 2024*

(a) Items of personal property may be purchased from approved vendors by third parties of the incarcerated person or purchased directly by the incarcerated person. Authorized items, appliances, or food may be acquired by utilization of this package procedure consistent with the APPS. The determining factor in the number of packages an incarcerated person may receive per year is the privilege group in which the incarcerated person is placed in accordance with the work or program.

(b) Incarcerated persons may obtain approved appliances and musical instruments from approved vendors by having them ordered by correspondents or using the funds in their incarcerated person trust account. A limit of three appliances applies to all incarcerated persons based upon the following definition, with the exception of female hair care appliances as described in Subsection 54030.10.6(a)(2).

(c) *Note*: For purposes of this Article, an appliance is defined as:

(1) Any electrical appliance, (excluding prescribed medical appliances and battery rechargers) that relies on institution power resources to operate (all electrical appliances are subject to the three appliance limit).

(2) Any audio or visual entertainment appliances, such as radios, televisions, cassette or disk players, etc. (all audio and visual appliances are subject to the three-appliance limit, regardless of electric or battery operated power source).

(3) Battery operated, non-entertainment appliances that do not rely on institution power resources (battery operated, non-entertainment appliances are not subject to the three-appliance limit).

(d) Items shall be shipped to the incarcerated person's respective institution by the approved vendor in a factory sealed container.

(e) It is the responsibility of the incarcerated person or the third party to ensure that packages are ordered in advance to ensure adequate delivery time.

(f) The year shall begin January 1 and end on December 31. The quarters are:

1st – January 1 through March 31.

2nd – April 1 through June 30.

3rd – July 1 through September 30.

4th – October 1 through December 31.

#### (g) Privilege Group A and Privilege Group B

Incarcerated persons in Privilege Groups A and B shall be allowed 4 packages per year (1 per quarter) not to exceed 30 pounds each. Maximum allowable package dimensions are 24" x 24" x 24".

#### (h) Privilege Group C

Incarcerated persons in Privilege Group C shall not be allowed a personal property package. Incarcerated persons prohibited from receiving a package resulting from recent placement into Privilege Group C shall not be allowed to retain a package which was ordered prior to Privilege Group C placement and received after placement in Privilege Group C. Disallowed packages shall be disposed of pursuant to Subsection 54030.12.2.

#### (i) Privilege Group D

(1) Incarcerated persons in Privilege Group D, including those incarcerated persons housed in Restricted Housing Unit (RHU), shall be permitted to acquire one personal property package per year not to exceed 30 pounds each. Maximum allowable package dimensions are 24" x 24" x 24". Eligibility to acquire a personal property package commences one year after the date of Privilege Group D assignment.

(2) Incarcerated persons in a RHU may also purchase an entertainment appliance via the Special Purchase Process. Eligibility to acquire an entertainment appliance commences one year after the date of Privilege Group D assignment.

(3) Incarcerated persons prohibited from receiving a package as a result of RHU placement shall be allowed to retain the package in their stored personal property if the package was ordered prior to RHU placement and the incarcerated person was otherwise qualified to receive it.

#### (j) Privilege Group U

Incarcerated persons in Privilege Group U shall not be allowed a personal property package.

(k) *Note*: The local Inter-Disciplinary Treatment Team (IDTT) may further restrict or allow additional authorized personal property on a case-by-case basis above that allowed by the incarcerated person's assigned privilege group.

### 54030.9  Personal Property Package Vendor Approval

(a) Vendors for personal property packages, except those vendors approved locally for special religious foods as provided for in Subsection 54030.7.1, shall receive Department approval prior to providing products to incarcerated persons.

(b) The Deputy Director, DAI, has the authority to establish vendor approval guidelines for personal property packages and to add or remove vendors from the Approved Incarcerated person Package Vendors list for vendor non-compliance concerns.

(c) Vendors shall submit a completed vendor application package to the Deputy Director, DAI. Requests for approval shall include all additional materials and catalogs of items provided with prices. The vendor name and contact information will be provided to the institutions upon approval.

(d) It is the intent of the Department to ensure Incarcerated person Package Program catalog items are priced competitively with common retailers in major markets.

(e) The CDCR reserves the right to withdraw any vendor approval subject to 30 calendar day's written notice to the vendor. However, any agreement can be immediately terminated for cause. The term "for cause" shall mean that the vendor fails to meet the terms, conditions, or responsibilities of an agreement. In this instance, the agreement termination shall be effective as of the date indicated on the State's notification to the vendor.

### 54030.9.1  Personal Property Package Vendor Criteria

(a) Vendors submitting requests for Department approval shall meet the following minimum requirements:

1. All merchandise offered for sale by the vendor is subject to price comparison. Price comparison shall be conducted by the CDCR during initial vendor approval and throughout the length of any agreement or contract based upon advertised catalog prices.

(A) Vendor's prices will be compared with non-sale prices on an identical product for product basis at major retailers in the following major California markets:

1. Fresno

2. Los Angeles

3. Sacramento

4. San Diego

(B) A resulting median price for the specific product will be identified. The vendor's advertised catalog price shall not exceed the median price by more than 10 percent.

(C) If identical items are not located during the initial price comparison in the major California markets identified above, the CDCR may extend the price comparison to include other California markets or online retailers, if necessary.

(D) If identical items are not located during an extended price comparison, similar items may be relied on as determined by the CDCR. The basis for any price comparison shall be the sole discretion of the CDCR.

(E) The vendors will be notified if the prices of merchandise are in excess of the 10 percent limit. If prices are determined by the CDCR to be excessive, the vendors will be requested to reduce prices within the acceptable price range as determined by the CDCR or remove the item from incarcerated person availability. Inability or unwillingness of or by the vendors to comply with a CDCR price reduction or removal request within 30 calendar days of notification shall be cause for termination of any agreement or contract and shall result in disapproval of the vendor to provide services.

2. Vendors shall maintain insurance with Commercial General Liability with Warehouse Legal Liability for a minimum of $1,000,000 per occurrence.

3. Vendors shall possess a valid California city or county business license (if applicable) or if a corporation located within the State of California, incorporation documents or letter from the Secretary of State or if not a California business, an affidavit that business is in good standing with the state, province, or country in which business is headquartered.

4. Vendors shall provide a self-certified Inventory Report showing a minimum of $250,000 worth (advertised retail value) of merchandise on premises (subject to physical verification by the CDCR).

5. All merchandise purchased by a single order shall be packaged in one single container. Multiple boxes are not permitted.

6. Vendors shall provide copies of CDCR approved catalogs and order forms, free of charge, to institutions. Catalog shall indicate prices for all items and expiration dates of prices. Prices advertised in catalogs shall have a guaranteed minimum term of 12 months.

7. Upon vendor's approval, all catalogs, order forms, and web sites shall prominently display the following disclaimer:

The California Department of Corrections and Rehabilitation (CDCR) has approved this independent vendor to sell merchandise to incarcerated persons and the public. CDCR's brief review and approval of this vendor was strictly limited to minimum security requirements and general business intent. The CDCR is not

affiliated with this vendor and does not guarantee that the vendor will fulfill any obligations, perform as expected, nor permanently remain in business, nor does the CDCR guarantee the vendor's products in any way. Any purchases from this vendor are at the buyer's sole risk. The CDCR assumes no liability whatsoever for such purchases, nor any aspect thereof. Any issues or disputes regarding the vendor's products are the sole responsibility of the buyer and the vendor, and the CDCR is not obligated to mediate or resolve any such disputes.

8. CDCR approved catalog shall only present items authorized for purchase by CDCR incarcerated persons based upon privilege group.

9. Catalog shall identify items allowable by privilege group as identified in Appendix A.

10. Vendors shall require customer to select a privilege group prior to completion of a purchase. The selection of a privilege group shall act to restrict the purchase of merchandise not allowed by the selected privilege group. Refer to the APPS located in Appendix A for more information.

11. Items listed in catalogs shall regularly be in stock. Catalogs and order forms shall clearly indicate that back orders or substitutions shall not be permitted. In the event that an item is out of stock, a refund will be issued to the purchaser.

12. Two copies of the purchase receipt or shipping invoice shall be included in each package and a copy shall be forwarded to the purchaser if purchased by a non-incarcerated person. (E-mail confirmation is acceptable for orders placed over the Internet.)

13. Maximum allowable package weight is 30 pounds. This weight limit includes merchandise, packing material, and packaging (tare weight). Packages in excess of 30 pounds shall not be accepted and will be returned at the vendor's expense.

14. The catalogs and web sites shall include the shipping weight of each individual item and a method of calculating the total gross weight of the incarcerated person package as customers are limited to a gross weight of 30 pounds or less.

15. Maximum allowable package dimensions are 24" x 24" x 24".

16. All catalogs and web sites shall clearly inform customer of the 30 pound weight limit.

17. All packages shall be labeled either Privilege Group A, B, or D based upon the contents of the package. Privilege Group D packages may only contain items authorized for Privilege Group D.

18. The vendor's return policy shall be clearly stated in catalogs and on web sites. The CDCR shall not be a party in any dispute between the vendor, incarcerated person or the purchaser.

19. Vendors are responsible to correct any errors in package contents. When an incorrect item is received in a vendor package, CDCR staff shall verify and may contact the vendor to request a United Parcel Service call tag in order to ship the incorrect item back to the vendor. This does not preclude individual facilities from alternative methods of resolution.

20. Vendors shall restrict knowledge of identities of both package recipients and purchasers from staff responsible for assembling packages.

21. Vendor's staff responsible for receiving orders, assigning purchase order numbers, and secure numerical identifiers shall not be allowed to assemble packages.

22. Vendors shall conduct pre-employment urinalysis testing on all employees and provide evidence of such on demand.

23. Vendors shall provide names and identification information of all staff on demand. Current state issued driver's licenses or identification cards are accepted as valid identification.

24. Vendors employing staff possessing felony convictions less than 10 years old shall be disqualified. Vendors employing staff possessing drug-related arrests or convictions less than 5 years old shall be disqualified.

25. Vendors shall be willing to submit to, and cooperate with, frequent CDCR inspections without notice.

26. Vendor's receiving, packaging, and shipping areas shall be monitored by a Closed Circuit Television System. Video tapes or other medium providing a record of activities in packaging and shipping areas shall be maintained for a minimum of 30 days. All videos shall provide a date and time stamp and the ability to identify vendor staff.

27. Vendors shall employ the security measures described in Subsection 54030.9.2.

28. Packages shall be sealed with tamper resistant tape.

29. Approval and use of vendors shall result in no expense to the CDCR.

30. Vendors shall be capable of supplying packages within no more than 10 days after purchase. Occasional delays in shipments are understood and will not be reason for disapproval of a vendor.

31. Institution personnel shall maintain a verified copy of the shipping invoice in order to assist in the resolution of any disputes between the vendor and the purchaser. However, all order disputes are solely between the purchaser and the vendor and shall be settled without additional involvement of the CDCR.

**54030.9.2  Shipping Security**

(a) Prior to each shipment of packages, the vendor shall provide the receiving institution a shipping manifest containing incarcerated person names, CDCR numbers, and a list of secure numerical identifiers (confidential purchase order numbers) that corresponds to each package shipped. The shipping manifest shall be sent to the institution via e-mail or facsimile (FAX) as determined by the institution. Under no circumstances shall the shipping manifest accompany the shipment of packages.

(b) Packages shall display only the secure numerical identifier. Neither the incarcerated person's name, CDCR number, shipping manifest containing secure numerical identifiers, nor any other incarcerated person identifying information may be shipped with a package. Standard shipping labels may be used, but shall only provide the vendors return address, the institution's address, and the secure numeric identifier. The numeric identifier and incarcerated person's Privilege Group shall be clearly displayed on each package to facilitate comparison with the shipping manifest.

**54030.9.3  Religious Personal Property Vendor Criteria**

(a) Vendors submitting requests for Department approval as vendors of religious property shall meet the following minimum requirements:

(1) All merchandise offered for sale by the vendor is subject to competitor price comparison. Price comparison shall be conducted by the CDCR during initial vendor approval and throughout the length of any agreement based upon advertised catalog prices.

(A) Vendors' prices will be compared with non-sale prices on an identical product for product basis.

(B) A resulting median price for the specific product will be identified. The vendor's advertised catalog price shall not exceed the median price by more than 10 percent.

(C) If identical items are not located during an extended price comparison, similar items may be relied on as determined by the CDCR. The basis for any price comparison shall be at the sole discretion of the CDCR.

(D) Vendors will be notified if the prices of merchandise are in excess of the 25 percent limit. If prices are determined by the CDCR to be excessive, the vendors will be asked to reduce prices within the acceptable price range as determined by the CDCR or remove the item from the catalog. Unwillingness or inability of the vendors to comply with a CDCR price reduction or request for removal within 30 calendar days of notification, shall be cause for termination of any agreement and shall result in disapproval of the vendors to provide services.

(2) Vendors shall maintain insurance with Commercial General Liability and Warehouse Legal Liability for a minimum of $1,000,000 per occurrence.

(3) Vendors shall possess a valid California city or county business license (if applicable) or if a corporation located within the State of California, incorporation documents or letter from the Secretary of State; or if not a California business, an affidavit the business is in good standing with the state, province, or country in which business is headquartered.

(4) Vendors shall provide a self-certified Inventory Report showing a minimum of $25,000 worth (advertised retail value) of merchandise on premises (subject to physical verification by the CDCR).

(5) All merchandise purchased by a single order shall be packaged in one single container. Multiple boxes are not permitted.

(6) Vendors shall provide copies of CDCR approved catalogs, product sheets and order forms, free of charge, to institutions. Catalogs shall indicate prices for all items and expiration dates of prices. Prices advertised in catalogs shall have a guaranteed minimum term of 12 months.

(7) Upon vendor's approval, all catalogs, product sheets, order forms, and web sites shall prominently display the following disclaimer:

The California Department of Corrections and Rehabilitation (CDCR) has approved this independent vendor to sell merchandise to incarcerated persons and the public. CDCR's brief review and approval of this vendor was strictly limited to minimum security requirements and general business intent. The CDCR is not affiliated with this vendor and does not guarantee that the vendor will fulfill any obligations, perform as expected, nor permanently remain in business, nor does

Operations Manual                DEPARTMENT OF CORRECTIONS AND REHABILITATION                CHAPTER 5

the CDCR guarantee the vendor's products in any way. Any purchases from this vendor are at the buyer's sole risk. The CDCR assumes no liability whatsoever for such purchases, nor any aspect thereof. Any issues or disputes regarding the vendor's products are the sole responsibility of the buyer and the vendor, and the CDCR is not obligated to mediate or resolve any such disputes.

(8) CDCR approved catalog or product sheet shall only present items authorized for purchase by CDCR incarcerated persons based upon the RPPM and privilege group.

(9) Catalog or product sheet shall identify items allowable by privilege group as identified in the RPPM.

(10) Vendors shall require customer to select a privilege group prior to completion of a purchase. The selection of a privilege group shall act to restrict the purchase of merchandise not allowed by the selected privilege group. Refer to the RPPM located in Appendix B for more information.

(11) Items listed in catalogs shall regularly be in stock. Catalogs, product sheets, and order forms shall clearly indicate that back orders or substitutions shall not be permitted. In the event that an item is out of stock, a refund will be issued to the purchaser.

(12) Two copies of the purchase receipt or shipping invoice shall be included in each package and a copy shall be forwarded to the purchaser if purchased by a non-incarcerated person. (E-mail confirmation is acceptable for orders placed over the Internet.)

(13) Maximum allowable package weight is 30 pounds. This weight limit includes merchandise, packing material, and packaging (tare weight). Packages in excess of 30 pounds shall not be accepted and will be returned at the vendor's expense.

(14) The catalogs and web sites shall include the shipping weight of each individual item and a method of calculating the total gross weight of the incarcerated person package as customers are limited to a gross weight of 30 pounds or less. All catalogs and web sites shall clearly inform customer of the 30 pound weight limit. Maximum allowable package dimensions are 24" x 24" x 24".

(15) All packages shall be labeled either Privilege Group A, B, C or D based upon the contents of the package. Privilege Group D packages may only contain items authorized for Privilege Group D.

(16) The vendor's return policy shall be clearly stated in catalogs and on web sites. The CDCR shall not be a party in any dispute between the vendor, incarcerated person or the purchaser.

(17) Vendors are responsible to correct any errors in package contents. When an incorrect item is received in a vendor's package, CDCR staff shall verify and may contact the vendors to request a United Parcel Service call tag in order to ship the incorrect item back to the vendors. This does not preclude individual facilities from alternative methods of resolution.

(18) Packages containing contraband shipped from the vendors will subject the vendors to removal from the CDCR Approved Incarcerated person Religious Vendors list.

(19) Religious oil bottle caps shall be sealed with shrink wrap. Any bottles received without shrink wrap will be disposed of in accordance with Subsection 54030.12.2.

(20) Vendors shall conduct pre-employment urinalysis testing on all employees and provide evidence of such on demand.

(21) Vendors shall provide names and identification information of all staff on demand. Current state issued driver's licenses or identification cards are accepted as valid identification.

(22) Vendors employing staff possessing felony convictions less than 10 years old shall be disqualified. Vendors employing staff possessing drug-related arrests or convictions less than 5 years old shall be disqualified.

(23) Vendors shall be willing to submit to, and cooperate with, frequent CDCR inspections without notice.

(24) Vendors shall document staff responsible for filling and shipping orders and maintain the information in the vendor's packaging and shipping areas.

(25) Packages shall be sealed with tamper resistant tape.

(26) Approval and use of vendors shall result in no expense to the CDCR.

(27) Vendors shall be capable of delivering packages within no more than 10 days after an order is placed. Occasional delays in shipments are understood and will not be reason for disapproval of a vendor.

(28) Institution personnel shall maintain a verified copy of the shipping invoice in order to assist in the resolution of any disputes between the vendor and the purchaser. However, all order disputes are solely between the purchaser and the vendor and shall be settled without additional involvement of the CDCR.

(29) The statewide CDCR Approved Incarcerated person Religious Vendors list may be reviewed by the Statewide Religious Review Committee (SRRC) and renewed annually.

(30) The SRRC may cap the number of religious vendors of like commodities. Selection of vendors may be based upon competitive merchandise pricing, policy compliance and review of vendor previous performance concerns.

(31) Vendors shall employ the security shipping measures described in Subsection 54030.9.2.

**54030.10   Property Classifications/Restrictions**

The following subsection gives direction on the control, possession, recording, and disposition of incarcerated person property.

**54030.10.1   Food and Hygiene**

(a) Incarcerated persons may possess food, personal care, and hygiene items in their quarters or living area consistent with their privilege group unless otherwise prohibited by departmental policy as outlined in CCR, Title 15, Subsection 3190(a). The maximum amount of food, personal care, and hygiene items an incarcerated person may possess shall not exceed the amount which can be purchased through the canteen by the incarcerated person in one month, as required by CCR, Title 15, Section 3094 and as described in CCR, Title 15, Subsection 3190(e). Incarcerated persons shall be required to maintain their purchase receipt to verify purchases until such items are expended. Possession of canteen items (personal hygiene and other miscellaneous items), except for consumable food items, shall be consistent with the six cubic foot limitation.

(b) Incarcerated persons shall be permitted to temporarily exceed the six cubic foot volume limit by the amount of the current month's purchase of consumable food items verifiable by the current month's canteen receipt. By the following month's canteen draw, the incarcerated person is expected to be within established volume limits.

(c) In the event the incarcerated person does not comply with these provisions for consumable food items (canteen in excess of the one month standard as described in CCR, Title 15, Section 3094 or exceeds the temporary excess allowed for consumable food items or is not able to produce a receipt for items) as described above, the incarcerated person will be required to dispose of property of their choice pursuant to Subsection 54030.12.2 to become compliant with the volume limitation policy.

**54030.10.2   Legal Materials**

(a) Incarcerated persons may possess legal materials, documents, and books in their quarters or living area consistent with the six cubic foot limitations, except as otherwise set forth in this subsection. In addition to the six cubic feet limitation of authorized property as set forth in this Article, incarcerated persons may possess up to one cubic foot of legal materials or documents related to their active cases in their assigned quarters or living area. Incarcerated persons may request that the institution securely store excess legal materials or documents related to their active case(s) when such materials or documents exceed this one cubic foot additional allowance. Only that material in excess of the additional one cubic foot shall be stored.

(b) *Note:* An active case may be defined as any legal action, cause, suit, writ, etc. that an incarcerated person is currently involved in writing or responding to.

(c) A suitable area as designated by the Warden shall be reserved for the storage of excess legal material. A log record of material(s) stored showing incarcerated person's name, CDCR number, date of storage, and the materials receipt and removal shall be required.

(d) The material shall be placed in a box and sealed at the time of storage with the initials of the incarcerated person and staff member involved. When the material is removed, the incarcerated person shall acknowledge its removal by signing the log record.

(e) Upon an incarcerated person's request, staff shall schedule appointments for the incarcerated persons to have access to their stored materials. Incarcerated persons shall have access to their stored legal material one time per week, if they have an active case.

(f) Incarcerated persons assigned to RHU shall provide the necessary identifying information for staff to access stored legal material. The incarcerated person is responsible for organizing stored legal material in a manner that allows staff to identify a specific box for exchange.

(g) Legal books shall not be stored by the institution. Incarcerated persons who require access to the excess active case legal materials or documents from secured storage may exchange such documents for active case materials or documents in their quarters or living area upon written request to the property coordinator or designee on a box-for-box basis while adhering to the limitations set forth in this subsection. Legal materials or documents and books that do not pertain to the

490

incarcerated person's active case(s) and are in excess of the allowable property limitation shall be disposed of pursuant to Subsection 54030.12.2.

### 54030.10.3   Correspondence Course Materials

Incarcerated persons may possess correspondence course materials, including textbooks, in their quarters or living area as approved by the Supervisor of Correctional Education Programs (SCEP) and designated custody staff consistent within the six cubic feet limitation. Correspondence courses requiring tools, construction kits, or other materials that may pose a threat to the institution's security or the safety of persons shall not be allowed. The SCEP shall provide the incarcerated person with a CDC Form 128B, General Chrono, indicating approval of the course and materials supplied. The incarcerated person shall display this chrono conspicuously in their quarters or living area.

### 54030.10.4   Incarcerated Person Handicraft

(a) Incarcerated persons who participate in handicraft programs may possess in their quarters or living area, handicraft articles, and written and artistic material produced or created by that incarcerated person, consistent with departmental regulations and within the six cubic feet limitation. Facilities may designate additional storage for handicraft articles and materials based upon availability of space. Excess handicraft items, articles, or materials in an incarcerated person's possession shall be confiscated and disposed of in accordance with Subsection 54030.12.2

(b) Incarcerated person donation of handicraft items, articles, tools, and materials to the institution is subject to provisions of Subsection 101050.14. Such articles shall be controlled by the handicraft manager, become the property of the State, and shall be utilized in the same manner as other State owned tools and materials.

### 54030.10.5   Education Materials

In addition to the six cubic feet limitation of authorized property as set forth in this Article, incarcerated persons who are assigned to institution Academic or Vocational Educational Programs shall be allowed to possess State provided textbooks or materials necessary to complete their education requirements in their quarters or living area. Incarcerated persons shall sign a CDCR Form 193, Trust Account Withdraw Order, for replacement costs prior to being issued the material. Incarcerated persons shall have posted in their cell a CDC 128-B signed by the appropriate instructor indicating the incarcerated person is authorized to possess the listed texts or materials. Any course textbooks furnished by the State shall be returned to the Education Department at the end of the course or upon the incarcerated person's transfer or parole. State supplies not returned in serviceable condition will result in the Trust Account Withdrawal form being submitted for the replacement value. The Supervisor of Correctional Education Programs shall be responsible for determination of the replacement value of educational supplies.

### 54030.10.6   Appliances and Musical Instruments

*Revised October 15, 2024*

**(a) Privilege Groups A and B**

(1) Incarcerated persons assigned to Privilege Group A or B may possess up to three appliances, with the exception of female hair care appliances, as indicated in Subsection 54030.8.

(2) Based upon incarcerated person grooming standards as described in CCR, Title 15, Subsection 3062(f) female incarcerated persons may possess up to four appliances when one of the appliances is a hair care appliance.

(3) *Note*: In order to facilitate female hair care needs, female institutions shall maintain a hairdryer in each housing unit for incarcerated person use.

(4) One musical instrument with case may be substituted as one of the three appliances in their quarters or living area consistent with the six cubic foot limitations. When an incarcerated person assigned to Privilege Group A or B is placed in Restricted Housing, any appliances and musical instrument shall be inventoried and stored pending the outcome of RHU placement. If the incarcerated person is released back to the general population and maintains their Privilege Group A or B status, the appliance(s) and musical instrument shall be returned to the incarcerated person. If the incarcerated person receives a RHU term, the incarcerated person shall be required to dispose of the appliance(s) and musical instrument in accordance with Subsection 54030.12.2.

(5) *Note:* Incarcerated persons housed at conservation camps shall not possess personal television sets.

**(b) Privilege Groups C and U**

(1) Incarcerated persons assigned to Privilege Group C or U may not possess any appliances (i.e., television, radio, CD player, etc.) or musical instruments, nor may they purchase any electrical entertainment or battery-operated type of appliances.

(2) When an incarcerated person is placed on Privilege Group C via a classification committee action, the incarcerated person shall be required to dispose of any appliance(s) and musical instrument in accordance with Subsection 54030.12.2.

**(c) Privilege Group D (RHU)**

(1) Incarcerated persons assigned to RHU may possess one entertainment appliance.

(2) Incarcerated persons assigned to RHU may possess or acquire through the incarcerated person personal property package process or Special Purchase process, two entertainment appliances as outlined above and as identified in the APPS located in Appendix A. Eligibility to receive an entertainment appliance commences on the date of Privilege Group D assignment. Incarcerated persons assigned to Privilege Group D may not possess a musical instrument.

### 54030.10.6.1   Additional Appliance/Musical Instrument Requirements

*Revised May 17, 2023*

(a) Appliances may be AC plug-in or may use an AC/DC adapter. Battery operated non-entertainment appliances shall not be counted against the three-appliance limit. Incarcerated persons may purchase and use rechargeable batteries with a recharger unit. Recharger units and AC/DC adapters are considered appliance accessories and shall not be counted as a separate appliance. Incarcerated persons shall not possess or use a remote-control device. Entertainment appliances with internal mechanisms for recording, downloading, or transmitting shall not be allowed. All appliances, including entertainment appliances, shall be portable models. Entertainment appliances with antennas shall be built in. Entertainment appliances shall have earphones or earplugs that shall be worn on the head or in the ear when the appliance is in use within the housing units.

(b) All appliances shall have the incarcerated person's name and CDCR number engraved on the back and be sealed by staff. Staff shall make the necessary entries on the incarcerated person's SOMS automated form ISSS051B before releasing the property to the incarcerated person. Any incarcerated person who breaks or tampers with the seal may be subject to disciplinary action and confiscation of the item. Incarcerated persons that are found guilty of breaking or tampering with the seals of any personal appliance may have the appliance confiscated and disposed of in accordance with Subsection 54030.12.2.

(c) Incarcerated persons ordering new or replacement appliances shall be required to purchase clear-case appliances. Non-clear case appliances shall be eliminated through attrition.

(d) Musical instruments and case combined dimensions shall not exceed 46" x 24" x 12".

### 54030.10.6.2   Repair of Appliances

(a) In the event of a malfunctioning appliance, the incarcerated person shall be responsible for returning the unit to R&R for shipment to an authorized repair vendor or institution vocational repair shop, if available. The incarcerated person shall have a minimum of $50 on their trust account for estimates only. If the unit costs more to repair, the incarcerated person shall be contacted regarding the cost. The incarcerated person shall forward the necessary funds to the vendor prior to repair.

(b) Incarcerated persons are prohibited from keeping inoperable appliances in their possession. Appliances that cannot be repaired or for which the incarcerated person has insufficient funds for repair shall be disposed of per Subsection 54030.12.2.

### 54030.10.7   Clear Technology

(a) Incarcerated persons shall be restricted to only clear personal care and hygiene items encased in clear containers or tubing based upon availability. An exemption from using clear personal care and hygiene items encased in clear containers or tubing shall only be authorized by the institution's health care manager or chief medical officer and only when an exemption is deemed medically necessary by a physician. Such exemption shall not exceed one year. If the condition persists, another exemption request shall be submitted by the incarcerated person.

(b) Incarcerated persons ordering new or replacement appliances shall be required to purchase clear case appliances. Incarcerated persons currently possessing non-clear case appliances shall be allowed to keep those appliances until they are no longer functioning. Non-functioning, non-clear case appliances are considered contraband and shall be disposed of according to Subsection 54030.12.2.

**54030.10.8  Personal Clothing**

Incarcerated persons shall not be permitted any personal clothing items other than those listed in the APPS located in Appendix A. No advertising, letters, or pictures depicting or reasonably associated with alcohol, Security Threat Group, profanity, sex, nudity, weapons, drugs, or drug paraphernalia shall be authorized.

**54030.10.9  Religious Items**

(a) Incarcerated persons may possess authorized personal religious items in accordance with the RPPM and which are consistent with the six cubic feet limitation.

(b) Custody staff shall consult the Religious Review Committee (RRC) when recommending the disapproval of religious items. The RRC shall forward recommended disapproval of religious items to the SRRC.

**(c) Procedures**

(1) Religious personal property items can be purchased by an incarcerated person or by a third party from a departmentally approved religious vendor. Purchases by an incarcerated person shall be paid for by utilizing funds from the incarcerated person's trust account.

(2) Items arriving via third parties, or items shipped from other than approved vendors, shall be returned or disposed of in accordance with Subsection 54030.12.2.

**54030.10.10  Membership Cards**

Incarcerated persons shall not possess any membership cards, identification cards, or service-type cards other than those issued by the Department.

**54030.10.11  Contraband**

(a) Anything not permitted or in excess of the maximum quantity permitted or no longer functioning as designed or that have been modified or tampered with or which is received or obtained from an unauthorized source is contraband. Possession of contraband may result in disciplinary action and confiscation of the contraband (CCR, Title 15, Section 3006).

(b) The incarcerated person shall be given a written notice for any item(s) of personal and authorized state-issued property that is removed from their quarters during an inspection or search and the disposition made of such property. The notice shall also list any contraband or any breach of security noted during the inspection or search.

**54030.11  Health Care Appliances**

(a) Approval for an incarcerated person to permanently or temporarily possess or retain a health care appliance requires a clinical prescription for the appliance and shall be documented on a CDC Form 128-C Medical, Psych, Dental, Chrono.

(b) Incarcerated persons shall be allowed to retain possession of a prescribed health care appliance until a health care evaluation is performed providing that safety and security of the institution will not be compromised. Health care appliances are not subject to the six cubic foot volume limitation nor count towards the three-appliance limit as described in Subsection 54030.8.

(c) Approved health care appliances include durable medical equipment, assistive devices, adaptive equipment, prosthetic or orthotic appliances, or equipment or medical support equipment, which include, but are not limited to:

(1) Eyeglasses.
(2) Prosthetic Eyes.
(3) Dental prosthesis.
(4) Prosthetic limbs.
(5) Orthopedic braces or shoes.
(6) Hearing aids.
(7) Wheelchairs.
(8) Canes.

**54030.11.1  Disallowance of Health Care Appliances**

Following review or inspection of the appliance should custody supervisor determine that a significant safety or security concern appears to exist, the institution Health Care Manager, Chief Medical Officer, Chief Physician and Surgeon, or Chief Dentist, Correctional Health Services Administrator, or Physician on Call, or Medical Officer of the Day shall be consulted immediately to determine actions required to safely accommodate the affected incarcerated person-patient's needs. Accommodation appropriate to the safety and security of the institution may include, but should not be considered limited to:

(a) Modification of the appliance. If this alternative is chosen, equivalent, effective, alternative accommodation shall be provided the incarcerated person-patient while the original appliance is being modified.

(b) Replacement of the appliance with an acceptable one. If this alternative is chosen, equivalent, effective, alternative accommodation shall be provided the incarcerated person-patient while the alternate appliance is being procured.

(c) Special housing. If this alternative is chosen, and housing in a medical bed is required because of nursing care needs that would not be necessary if the incarcerated person-patient could be allowed an effective appliance, the incarcerated person-patient shall be seen as being housed solely on the basis of a disability.

(d) Expedited transfer to a designated institution.

(e) Substitution of non-medical personal services for an appliance (where Incarcerated person Assistant programs have been established) or expedited transfer to an institution where such programs exist.

**54030.12  Property Issuance**

*Revised May 17, 2023*

(a) When issuing items of property to an incarcerated person, whether originating from a special purchase or an incarcerated person package, issuing staff are required, at a minimum, to visually observe and physically hand each item of registerable and non-registerable property to the incarcerated person. Staff shall not be responsible for conducting an inventory of non-registerable property during the issuance process.

(b) Prior to issuing a special purchase or an incarcerated person package to the incarcerated person, Receiving and Release staff shall log the package on the SOMS automated form ISSS053B Property Package Received.

(c) At the completion of the issuance process, the incarcerated person shall verify that the property is correct as compared with the shipping invoice contained inside the package by signing the staff copy of the shipping invoice. If a discrepancy is identified, the incarcerated person is responsible for showing the discrepancy to staff who shall note the discrepancy on the staff copy of the invoice. One copy of the invoice is retained by the institution for a minimum of one year and one copy of the invoice is provided to the incarcerated person. While resolution of discrepancies is strictly between the purchaser and the vendor, the copy of the invoice maintained by institutional staff shall serve as verification of any discrepancy claims.

**54030.12.1  Property Registration**

*Revised May 17, 2023*

(a) Personal property items, which are not consumable and that possess enough intrinsic value to be a significant target for theft or bartering, are considered registerable property. Registerable personal property is identified in the APPS located in Appendix A.

(b) When designated items are identified as registerable, such items shall be registered under the incarcerated person's name and CDCR number on SOMS automated form ISSS051A, Registerable Property Items. Staff shall include the purchase date and purchase price, and attach a copy of the purchase receipt in the SOMS automated form ISSS051B. If the ability to scan the receipt into SOMS is unavailable, institutions shall maintain a paper copy of the receipt.

(c) It is the responsibility of the incarcerated person to account for all registerable property listed on the SOMS automated form ISSS051A. Staff shall document property incarcerated persons cannot account for on appropriate forms (CDC Form 128-A, Custodial Counseling Chrono, Rules Violation Report, or both).

(d) The incarcerated person shall report, in writing, all registerable property that is lost, stolen, or worn-out to R&R personnel as soon as the loss or unusable wear is discovered. A description of the item(s) and the circumstances surrounding the loss shall be included in the report.

**54030.12.2  Processing Unauthorized Property**

*Revised October 15, 2024*

(a) Unauthorized incarcerated person personal property, including that which is altered, exceeds volume limitations, or is beyond repair, shall be disposed of in accordance with the provisions of this subsection. The institution shall not store unauthorized incarcerated person property except as provided for incarcerated persons placed in RHU as provided for in Subsection 54030.13.2. (b) Incarcerated persons shall sign the SOMS automated form ISST200 indicating their choice of disposition and agreement to the method for disposing of their property. If the incarcerated person makes no selection or has insufficient funds, staff shall document that fact and determine the method of disposition. Unauthorized personal property shall be disposed of as follows:

(1) Mail the item to an address provided by the incarcerated person via United States Postal Service (USPS) or common carrier at the incarcerated person's expense. This option is not available for incarcerated persons with insufficient funds in their trust account. Failure to provide an address of an individual willing to accept the personal property results in the property being donated to a charitable organization, donated to the institution, or rendered as useless and disposed of per institution procedures. Incarcerated persons are not permitted to send their

property to any State agency or agent of the State. Failure to comply may result in disciplinary action.

(2) Return the item to the sender via USPS or common carrier at the incarcerated person's expense. This option is not available for incarcerated persons with insufficient funds in their trust account.

(3) Unopened packages may be refused and returned to sender. Staff shall complete a CDCR Form 1819, Notification of Disapproval for Mail/Packages/Publications, to notify the incarcerated person the package has been returned.

(4) Donate the item to a charitable organization as designated by the institution.

(5) Donate the item to the institution.

(6) Render the item useless and dispose of it according to institution procedures.

### 54030.13   Movement of Personal Property
*Revised October 15, 2024*

The following subsection gives direction, disposition, and processing of incarcerated person property when being transferred, placed in RHU, Out-to-Court, Out-to-Medical, or extradition.

### 54030.13.1   Transfers
*Revised May 17, 2023*

(a) Upon an incarcerated person's transfer between CDCR institutions, the sending institution shall inventory the incarcerated person's property on a SOMS automated form ISST200. R&R staff shall account for all personal property and document the disposition of any property not allowed at the receiving institution. For purposes of incarcerated person transport, canteen and hygiene are included within the six cubic feet of allowable property.

(b) The APPS shall be used as the basis for determination of property decisions. Changes in an incarcerated person's privilege group and volume limitations are addressed in the APPS located in Appendix A.

(c) When the incarcerated persons report to R&R with their personal property, they shall be informed that any item that cannot be transported or will not be accepted at the receiving institution shall be disposed of by the methods outlined in Subsection 54030.12.2.

(d) A signed copy of the SOMS automated form ISST200 shall be placed in each box containing the incarcerated person's personal property. A copy shall also be provided to the incarcerated person and a copy retained by the sending R&R and receiving institution to facilitate the resolution of incarcerated person property claims. The receiving institution shall document the disposition of any disallowed property items that were not identified and confiscated by the sending institution.

(e) The CDC Form 143 shall be completed by R&R staff and a copy shall be provided to transporting staff.

(f) All boxes and containers used to transport incarcerated person property shall not exceed

24" x 24" x 24" maximum dimensions nor contain in excess of 30 pounds of property each.

(g) All health care appliances belonging to an incarcerated person shall be transported with the incarcerated person. Upon an incarcerated person paroling, all health care appliances permanently issued to the incarcerated person shall be retained and maintained by the incarcerated person. Health care appliances temporarily issued to the incarcerated person for use during incarceration shall be retained at the institution.

(h) Upon the incarcerated person's arrival at the receiving institution, staff shall issue their personal property in accordance with current departmental regulations. Personal property shall be issued as soon as possible, but no later than 15 calendar days from when the personal property arrived at the receiving institution.

### 54030.13.2   Temporary Placements, Transfers, and Returns
*Revised October 15, 2024*

(a) Restricted Housing Unit

(1) Unissued authorized property for incarcerated persons on RHU status shall be inventoried by appropriate staff and stored in areas designated for property storage pending the outcome of RHU placement. Property inventory shall be completed in accordance with Subsection 54030.6.

(2) Upon initial RHU placement, the institution shall provide the incarcerated person basic hygiene and writing materials, (i.e., fish kit). In addition, the incarcerated person shall be provided access to their personal address book and stamps in order to facilitate access to correspondents and the courts.

(3) If the Institution Classification Committee retains the incarcerated person in RHU after initial RHU review, the incarcerated person shall have access to canteen as provided for in Subsection 54070.6.1 based upon a schedule determined by the facility. Additionally, the incarcerated person shall have access to all authorized personal property as determined by the APPS located in

Appendix A. The personal property shall be issued as soon as possible, but no later than 15 calendar days from the date the incarcerated person was retained in RHU.

(4) If the incarcerated person is released back to the general population and maintains their original Privilege Group status, the personal property shall be returned to the incarcerated person as soon as possible, but no later than 15 calendar days. If the incarcerated person receives a RHU term, the incarcerated person shall be required to dispose of all unauthorized property prior to transfer in accordance with Subsection 54030.12.2.

(b) The property of incarcerated persons on temporary transfer status shall be processed as follows:

(1) Out-to-Court

(A) Incarcerated persons going Out-to-Court who are not returning the same day shall report to R&R with all of their personal property. R&R staff shall inventory and store the property until the incarcerated person returns from court. If an incarcerated person is paroled or discharged while on Out-to-Court status, all tangible property, such as clothing, appliances, and paperwork shall be stored for a period of one year. Intangible property, such as incarcerated person funds, shall be maintained for a period of three years. If no claim is made on the property after expiration of time frames, final disposition shall be in accordance with PC Sections 5062 and 5063.

(B) In institutions that have authorized property storage areas within the housing unit, staff from the respective unit may inventory and store the incarcerated person's property.

(C) Upon returning to the institution, the incarcerated person's personal property shall be returned as soon as possible, but no later than 15 calendar days from their date of return. If the incarcerated person is transferred to another institution, their personal property shall be shipped to the receiving institution and issued as soon as possible, but no later than 15 calendar days from the date the property is received by the receiving institution.

(2) Hospital, Out-Patient Housing Unit or Correctional Treatment Center

(A) Incarcerated persons transferring to the hospital, Out-Patient Housing Unit (OHU), or Correctional Treatment Center (CTC) who are not returning the same day shall turn in all property to the housing unit officer or R&R. The property shall be inventoried and properly stored in accordance with this subsection until the incarcerated person returns from the hospital, OHU, or CTC.

(B) Incarcerated persons going to the hospital, OHU, or CTC and returning the same day shall not be required to store their property in the property room.

(C) Incarcerated persons placed in the hospital, OHU, or CTC due to accident or emergency shall have their property collected, inventoried, and stored in R&R (or other approved area) by the housing unit officer or designee.

(D) Incarcerated persons transferring on medical and return status to other institutions shall store their property in R&R or other designated areas.

(3) Return

Upon release and return from the hospital, OHU, CTC, or special housing units, the incarcerated person's property shall be returned as soon as possible, but no later than 15 calendar days. If the incarcerated person is transferred to another institution, their personal property shall be shipped to the receiving institution and issued as soon as possible, but no later than 15 calendar days from the date the property is received by the receiving institution. The incarcerated person shall be provided an opportunity to sign for their property inventory to acknowledge receipt. Issuing staff shall document instances where an incarcerated person refuses to provide a signature acknowledging receipt of their property.

### 54030.13.3   Extradition

(a) Incarcerated persons or supervised persons requiring extradition transport from any state or territory of the United States are personally responsible for the disposition of their personal property. It is the incarcerated person's responsibility to make arrangements with the holding agency for the disposal, storage, or mailing of their property prior to being transported by extradition agents. Extradition agents shall not be responsible for incarcerated person property left at the sending agency or institution. At no time shall incarcerated person property be checked onto airplanes or transported in the baggage compartment of the aircraft. The only exception is wheelchairs or other prescribed health care appliances.

(b) Incarcerated persons being extradited shall not retain any property on their person except prescribed medications and health care appliances as necessary, e.g., prescribed eyeglasses. Only authorized property that can fit into a 10" x 12" clasp envelope including, but not limited to, jewelry, wallet, watch, family pictures, or printed material shall be allowed to be transported with the incarcerated person. Incarcerated person property shall be inventoried on a CDCR Form 1083. A copy of the CDCR Form 1083 shall be placed in the sealed envelope, a copy shall be provided to the incarcerated person, and a copy shall be

retained by the extradition agent. The envelope shall then be secured in the agent's carry-on baggage or secured compartment in a transportation vehicle. The incarcerated person may wear their own clothing and shoes if deemed appropriate for transport purposes by the assigned State agents.

(c) Incarcerated persons being extradited from the CDCR to other jurisdictions, states, or territories of the United States may be allowed to retain all or a portion of their property as determined by the transporting extradition agent. In cases where personal property is not permitted to be transported, incarcerated persons shall be provided the opportunity to select appropriate disposition of their property as follows:

(1) Incarcerated persons permanently transferring to the custody of another agency shall be provided with the opportunity to mail all property to an address of their choosing via the USPS or common carrier at the incarcerated person's expense.

(2) Indigent incarcerated persons shall have property shipped to an address of their choosing at the CDCR's expense.

(3) *Note*: If no address is provided or previously mailed property is returned as undeliverable, all tangible property shall be placed in storage for a period of one year. Intangible property shall be maintained for a period of three years. If no claim is made on the property after expiration of time frames, final disposition shall be in accordance with PC Sections 5062 and 5063.

(4) Incarcerated persons temporarily transferring OTC and other temporary transfers, shall have property stored pending their return to CDCR custody. All property will remain in storage until the incarcerated person is either returned to CDCR custody or paroled or discharged. If paroled or discharged, all tangible property shall be stored for a period of one year. Intangible property shall be maintained for a period of three years. If no claim is made on the property after expiration of time frames, final disposition shall be in accordance with PC Sections 5062 and 5063.

### 54030.14   Release Clothing

Incarcerated persons scheduled for parole or awaiting discharge may be sent a release-clothing package via USPS or common carrier no earlier than 30 days prior to their scheduled parole or discharge date. Incarcerated person release-clothing packages, limited to one set of clothing, shall be retained in a secure location by departmental staff.

### 54030.15   Escapees' Property

(a) The Department shall not assume responsibility for property abandoned by an escapee until such time as the escape is discovered and the property is inventoried.

(b) All personal property of escapees shall be inventoried and transferred to the investigating lieutenant. In accordance with PC Section 5062 tangible property shall be stored for a period of one year. Intangible property shall be maintained for a period of three years. Final disposition of property shall be in accordance with PC Sections 5062 and 5063.

### 54030.16   Deceased Incarcerated Person Property

*Revised May 17, 2023*

(a) All personal property of a deceased incarcerated person shall be inventoried on a SOMS automated form ISST200 and stored in a location designated by the Warden. The deceased incarcerated person's Central File shall be reviewed for written directions of the decedent as to the next-of-kin. The deceased incarcerated person's property shall be shipped to the next-of-kin as designated on the SOMS – Notification in Case of Death, Serious Injury, or Serious Illness, at the incarcerated person's expense. If funds are not available in the incarcerated person's trust account, the property shall be shipped to the person designated on the SOMS – Notification in Case of Incarcerated person Death, Serious Injury, or Serious Illness only after contact and willingness to receive property is established.

(b) If no willing recipient can be identified or previously mailed property is returned as undeliverable, all tangible property shall be placed in storage for a period of one year. Intangible property shall be maintained for a period of three years. If no claim is made on the property after expiration of time frames, final disposition shall be in accordance with PC Sections 5062 and 5063.

### 54030.17   Revisions

The Deputy Director, Facility Support, DAI, shall ensure the contents of this Article are current.

### References

PC §§ 2085, 2600, 2601, 5054, 5058, 5061, 5062, 5063.

CCR, Title 15, Division 3, §§ 3002, 3006, 3010, 3011, 3044, 3064, 3092, 3101, 3102, 3151, 3152, 3161, 3164, 3170.1(g), 3190, 3191, 3193, 3287, 3331(c), 3343(g).

*In re Rodney Alcala* (1990) 222 Cal.App.3d 345

### Revision History

Revised: December 30, 2005

Revised: March 16, 2020

Revised: October 15, 2024 Sections: 54030.5(d);54030.7(a)(2), 54030.7(d), 54030.7.1(b), 54030.8(i)(1)-(i)(3), 54030.10.2(f), 5403010.6(a)(4) 54030.10.6(c)(1)-(c)(2), 54030.12.2(a), 54030.13, 54030.13.2(a)(1)-(a)(4), 54030.13.2(b)(2) and 54030.17. Adopted sections 54030.13.1(h), 54030.13.2(b)(1)(C).

## Article 44 — Prison Rape Elimination Policy

*Revised May 19, 2020*

### 54040.1   Policy

The California Department of Corrections and Rehabilitation (CDCR) is committed to providing a safe, humane, secure environment, free from incarcerated person on incarcerated person sexual violence, staff sexual misconduct, and sexual harassment. This will be accomplished by maintaining a program to address education/prevention, detection, response, investigation, and tracking of these behaviors and to address successful community re-entry of the incarcerated person. CDCR shall maintain a zero tolerance for sexual violence, staff sexual misconduct and sexual harassment in its institutions, community correctional facilities, conservation camps, and for all incarcerated persons under its jurisdiction. All sexual violence, staff sexual misconduct, and sexual harassment is strictly prohibited. This policy applies to all incarcerated persons and persons employed by the CDCR, including volunteers and independent contractors assigned to an institution, community correctional facility, conservation camp, or parole.

Retaliatory measures against employees or incarcerated persons who report incidents of sexual violence, staff sexual misconduct or sexual harassment as well as retaliatory measures against those who cooperate with investigations shall not be tolerated and shall result in disciplinary action and/or criminal prosecution. Retaliatory measures include, but are not limited to, coercion, threats of punishment, or any other activities intended to discourage or prevent a staff or incarcerated persons from reporting the incident(s) or cooperating with investigation of an incident(s).

### 54040.2   Purpose

The purpose of this policy is to ensure compliance with Public Law 108-79, the Prison Rape Elimination Act of 2003 (PREA), California Assembly Bill 550 (Chapter 303, Statutes of 2005), the Sexual Abuse in Detention Elimination Act, and 28 Code of Federal Regulations, Part 115, National Standards to Prevent, Detect, and Respond to Prison Rape. It will provide guidelines for the prevention, detection, response, investigation, and tracking of sexual violence, staff sexual misconduct and sexual harassment against CDCR incarcerated persons. A further purpose of this policy is to provide guidelines for the successful community re-entry of incarcerated persons.

Lastly, this policy informs staff of their responsibility and liability as specified in the law.

### 54040.3   Definitions

#### Aggressor

A person who attempts to commit, or commits sexual violence, staff sexual misconduct or sexual harassment.

#### Bisexual

A person who is sexually attracted to both sexes.

#### Coercion

A threat, however communicated, to commit an offense; to inflict bodily injury in the future on the person threatened or another, to accuse a person of any offense, to harm the credit or business reputation of any person, to take or withhold action as a public servant, or to cause a public servant to take or withhold action.

#### Cross-Gender

Of the opposite biological sex. Example: Male Custody Staff patting down female incarcerated persons is cross-gender searching.

#### Gay

A person who is attracted to people of the same gender.

494

EXHIBIT C

Case 2:21-cv-04066-GW-DFM   Document 9 Filed 05/05/21   Page 33 of 37   Page ID #:893

## California Men's Colony
## Property Search Receipt/Notice

In accordance with California Code of Regulations, Title 15, § 3287(4) this notice is being issued to you due to a search having been done on your cell.

Date: 5-8-20  Occupant: WHITE  CDCR#: AISO74  Facility: C  Building/Dorm: 6  Cell/Bed: 159

Occupant: _____  CDCR#: _____  Facility: ____  Building/Dorm: _____  Cell/Bed: _____

| Quantity | Item(s) Impounded | Personal/State | | Reason* | | | | Disposition** | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BLACK/GREEN GLOVES | (P) | S | A | (U) | E | D | (A) | B | C | D |
| 1 | TENNIS SHOES (NIKE) | (P) | S | A | (U) | E | D | (A) | B | C | D |
| 1 | TV ANNTENA | (P) | S | A | (U) | E | D | (A) | B | C | D |
| | | P | S | A | U | E | D | A | B | C | D |
| | | P | S | A | U | E | D | A | B | C | D |
| | | P | S | A | U | E | D | A | B | C | D |

Breach of Security–Follow up Action/Comments. ***

Inspecting Officer(s) J. SANCHEZ
Print Name                                              Signature

*Reason:    A = Altered    U = Unauthorized    E = Excess    D = Dangerous
**Disposition:    A = Disposed of per Title 15, §3191(c)    B = Turned over to R & R    C = Secured as evidence    D = Other (explain in Comments section)
***Any breach of security will be noted in this area and what follow-up action will be taken, i.e. work order or disciplinary (128A/115).

CMC-214 (6/16) DTP

White: **Inmate**    Yellow: **Program Sergeant**

## California Men's Colony
## Property Search Receipt/Notice

In accordance with California Code of Regulations, Title 15, § 3287(4) this notice is being issued to you due to a search having been done on your cell.

Date: 5-8-20  Occupant: WHITE  CDCR#: AI 5074  Facility: C  Building/Dorm: G  Cell/Bed: 159

Occupant: _____ CDCR#: _____ Facility: _____ Building/Dorm: _____ Cell/Bed: _____

| Quantity | Item(s) Impounded | Personal/State | | Reason* | | | | Disposition** | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | CUPS | (P) | S | A | U | (E) | D | (A) | B | C | D |
| 3 | Bowls | (P) | S | A | U | (E) | D | (A) | B | C | D |
| 2 | Athleac Shorts | (P) | S | A | U | (E) | D | (A) | B | C | D |
| 1 | Sweat top | (P) | S | A | U | (E) | D | (A) | B | C | D |
| 1 | Ortho Boots | P | (S) | A | (U) | E | D | (A) | B | C | D |
| 6 | Boxes of legal Paperwork | (P) | S | A | U | (E) | D | A | B | C | D |

**Breach of Security--Follow up Action/Comments. \*\*\***

Inspecting Officer(s)

Print Name                                    Signature

*Reason:     A = Altered      U = Unauthorized      E = Excess      D = Dangerous
**Disposition:   A = Disposed of per Title 15, §3191(c)      B = Turned over to R & R      C = Secured as evidence     D = Other (explain in Comments section)
***Any breach of security will be noted in this area and what follow-up action will be taken, i.e. work order or disciplinary (128A/115).

CMC-214 (6/16) DTP

White: **Inmate**     Yellow: **Program Sergeant**

EXHIBIT D

STATE OF CALIFORNIA
INMATE PROPERTY INVENTORY
CDCR 1083 (Rev. 05/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

NAME: WHITE   CDCR#: AI-5074   INSTITUTION: CMC-E   DATE: 4-10-

REASON FOR INVENTORY: ASU PLACEMENT   SENT TO: ASU   # OF BOXES: 7   # OF BAGS: 3

## Personal Clothing
- ☑ Athletic Shorts — 3
- ☐ Athletic Supporter —
- ☒ Briefs / Boxers — 1
- ☒ Hats and Caps — 2
- ☐ Head Band —
- ☐ Rain Coat / Poncho —
- ☐ Shoelaces —
- ☒ Shower Shoes — 2
- ☐ Slippers / House Shoes —
- ☒ Socks — 1
- ☒ Sweat Pants — 4
- ☐ Sweat Shirts —
- ☐ Tennis Shoes: ___
- ☒ Thermal Tops — 9
- ☐ Thermal Bottoms —
- ☒ Undershirts — 2
- ☒ Wave Caps — 1

### Female Specific
- ☐ Brassieres —
- ☐ Pajama / Nightgown —
- ☐ Panties —
- ☐ Personal Jeans —
- ☐ Robe —
- ☐ Sandals: ___
- ☐ Scarf —
- ☐ Walking Shoes: ___

## Personal Care/Hygiene
- ☐ After Shave —
- ☒ Body Powder — 2
- ☐ Comb/Hair Pick —
- ☐ Cosmetic / Shave Bag —
- ☐ Cotton Swabs —
- ☐ Denture Adhesive —
- ☐ Denture Cleanser —
- ☒ Dental Flossers / Gliders — 1
- ☐ Depilatory's (Magic Shave —
- ☒ Deodorant — 2
- ☐ Face Cream (Noxzema) —
- ☐ Conditioner —
- ☒ Hair Oil / Grease — 1
- ☐ Hair Ties —
- ☐ Insect Repellant —
- ☐ Laundry Detergent —
- ☐ Laundry Soap Bar —
- ☐ Lip Balm —
- ☒ Lotions / Baby Oil — 5
- ☒ Medication /Over Counter — 12
- ☐ Mirror —
- ☒ Mouth Wash — 1
- ☐ Muscle / Vapor Rub —
- ☒ Nail Clipper — 1
- ☐ Palm Brush / Comb —
- ☐ Perm Curl / Relax Kit —
- ☐ Perm Wave Kit —
- ☐ Perm Wave Rods —
- ☐ Petroleum Jelly —
- ☐ Razors, Disposable —
- ☐ Shampoo —
- ☐ Shaving Cream / Gel —
- ☒ Soap Bars — 8
- ☐ Soap liquid-body wash/dish —
- ☐ Sunblock —
- ☒ Toothbrush — 7
- ☒ Toothbrush Holder — 1
- ☒ Toothpaste / Powder — 4
- ☒ Wash Cloths — 2

## Female Specific
- ☐ Bath Towel —
- ☐ Blush —
- ☐ Brush —
- ☐ Cotton Balls —
- ☐ Douche —
- ☐ Emery Board —
- ☐ Eyebrow Pencil / Eyeliner —
- ☐ Eye Shadow Kit —
- ☐ Fabric Softener —
- ☐ Facial Astringent —
- ☐ Facial Cleanser —
- ☐ Feminine Hygiene Wash —
- ☐ Foundation —
- ☐ Hair Clips / Scrunches —
- ☐ Hair Sprays —
- ☐ Hair Rollers —
- ☐ Lip gloss / Liner / Lipstick —
- ☐ Mascara —
- ☐ Pumice Stone —
- ☐ Shower Bag —
- ☐ Shower Cap —
- ☐ Shower Puffs / Loofah —
- ☐ Tweezers —

## Food
- ☐ Artificial Sweetener —
- ☐ Beverages —
- ☐ Candy: Bags ___ Bars ___
- ☒ Canned Food — 2
- ☒ Cereals — 4
- ☐ Cheese —
- ☐ Chips / Taco Shells —
- ☐ Cocoa —
- ☐ Cookies —
- ☐ Coffee —
- ☒ Condiments — 21
- ☐ Crackers —
- ☐ Creamer —
- ☐ Dry Mix Drinks —
- ☒ Food Pouches — 18
- ☒ Supplements — 12 Js
- ☒ Meats, Dry — 4
- ☐ Snack Items —
- ☐ Nuts —
- ☐ Peanut Butter —
- ☒ Precooked Foods — 7
- ☐ Protein Supplements —
- ☒ Soups / Noodles — 22
- ☐ Tea (Instant or Bags) —
- ☐ Vitamins —
- ☐ Dried Fruit/Veg (Female) —

## Miscellaneous Items
- ☐ Address Book —
- ☐ Audio Cassettes —
- ☒ Ballpoint Pens — 7
- ☐ Battery Recharger —
- ☒ Batteries — 6
- ☐ Books / Magazines / Newspapers
- ☒ Bowl — 5
- ☐ Calendar —
- ☐ Can Opener —
- ☐ Card Stock / Drawing —
- ☐ Chalk / Pastels —
- ☐ Clock —
- ☐ Combination Lock —
- ☒ Compact Discs — 10

## Correspondence Course — MISC
- ☐ Ear Plugs —
- ☐ Envelopes —
- ☐ Envelopes, Metered —
- ☒ Extension Cord — 1
- ☐ Greeting Cards —
- ☐ Handkerchiefs/Bandannas —
- ☒ Legal Material — MISC
- ☐ Legal Pads / Tablets —
- ☒ Legal Size Folders Etc. — MISC
- ☐ Light Bulb —
- ☐ Pencils —
- ☐ Pencil Eraser —
- ☐ Pencil Sharpener —
- ☐ Photos, Loose —
- ☐ Photo Albums —
- ☐ Reading Glasses —
  (Non-prescription - magnifying glasses)
- ☐ Stamps —
- ☐ Stationery —
- ☐ Sun Glasses —
- ☐ Storage Container —
- ☒ Tumbler / Cups — 3
- ☐ Wallet —

### Female Specific
- ☐ Antenna Wire (CIW only) —
- ☐ Clothes Pins —
- ☐ Eyeglass Repair Kit —
- ☐ Footlocker (CIW only) —
- ☐ Hangers —
- ☐ Immersion Heater —
- ☐ Umbrella (CIW only) —

## Games
- ☐ Cards   ☐ Checkers   ☐ Chess
- ☐ Dominoes   ☐ Scrabble
- ☐ Uno (Female Only)

## Religious Items
- ☐ Altar Cloth
- ☐ Head Band Bead
- ☐ Wrist Band bead
- ☐ Choker Bead
- ☐ Beading Materials: ___
- ☐ Bowl/Chalice ___ ☐ Chalk ___
- ☐ Religious Medallion & Chain
  Color ___ Material ___
- ☐ Devotional Scapular
- ☐ Dream Catcher
- ☐ Feathers
- ☐ Head Gear ___ ☐ Medicine Bag
- ☐ Miswak ___ ☐ Powders ___
- ☐ Prayer Beads ☐ Prayer Oil ___
- ☐ Prayer / Holy cards / Photos ___
- ☐ Prayer Rug/Mat ☐ Prayer Shawl
- ☐ Rune Tiles ☐ Sea Salt ___
- ☐ Stones ___ ☐ Tallit Kalan/Tsitsit
- ☐ Tarot / Rune Cards ☐ Wand
- ☐ Tefillin / Phylacteries ___
- ☐ Herbs: ___

## Registerable Property
- ☐ Audio Entertainment Appliance
  ☐ AM/FM ☒ CD ☐ Cassette
  Make: AMPD
  S/N: 51161
- ☐ Calculator: ___
- ☐ CD Wallet
- ☐ Ear Buds / Headphones
  Make: ___
- ☐ Fan: ___
- ☒ Hair Clipper / Trimmer
  ☐ A/C ☒ Battery
  Make: NORELCO
- ☐ Handicraft: ___
- ☒ Hot Pot: BUSHY CREEK
- ☐ Lamp/Book Light
  ☐ A/C ☐ Battery
  Make: ___
- ☐ Musical Instrument: ☐ String
  Make: ___
  S/N: ___
- ☐ Razor / Groomer
  Make: ___
  ☐ A/C ☐ Battery
- ☒ Wedding Ring (CRACKED)
  ☒ White Metal ☐ Yellow Metal
  Stones ☐ Yes ☐ No
- ☒ Television: ☐ B&W ☐ Color
  ☐ With CD player ☐ With Radio
  Tested: ☒ Works ☐ Doesn't Work
  Make: CLEAR TUNES
  S/N: n/a
- ☐ Electronic Tablet
  Make: ___
  S/N: ___
- ☐ MP3
  Make: ___
  S/N: ___
- ☐ Adapter ☐ Coaxial Cable
  ☐ Splitter ☐ Digital Antenna
- ☐ Typewriter
  ☐ Manual ☐ A/C ☐ Battery
  Make: ___
  S/N: ___
- ☒ Watch: ☒ Wrist ☐ Pocket
  Make: UNLISTED Color SILVER/PINK
- ☒ Battery Charger
  Make: AC DELCO

### Female Specific
- ☐ Chain / Necklace / Bracelet
  ☐ White Metal ☐ Yellow Metal
- ☐ Curling / Flat / Straightening Iron
  Make: ___
- ☐ Earrings: ___
- ☐ Hair Dryer
  Make: ___
- ☐ Hair Rollers
  Make: ___
- ☐ Pressing Comb
  Make: ___

Health Care Appliances

☐ With this signature, I agree that the above listed property is the extent of ALL my property.
_Thomas White_ (Inmate Signature (upon Inventory))   AI5074 (CDC #)   4-10-20 (Date)

☐ With this signature, I am receiving the property as marked on this inventory sheet.
Inmate Signature (upon Inventory) ___   CDC # ___   Date ___

☐ Property Inventoried by: J. SANCHEZ
Staff Name (Print & Signature)   4-10-20 (Date)

☐ Property Received by: ___
Staff Name (Print & Signature)   Date ___

☐ Property Issued to Inmate by: ___
Staff Name (Print & Signature - upon Inventory)   Date ___

### Additional Items
KNEE BRACE
ORTHO BOOTS
ORTHO INSOLE

DISTRIBUTION •   Original: R&R,   Copies: Inventory Officer, Inmate. Retained in Property being Shipped/Transported

STATE OF CALIFORNIA
INMATE PROPERTY INVENTORY
CDCR 1083 (Rev. 05/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

NAME: WHITE    CDCR#: AZ 5074    INSTITUTION: CMC-E    DATE: 5-8-20

REASON FOR INVENTORY: ASU Placement    SENT TO: ASU    # OF BOXES: 3    # OF BAGS:

### Personal Clothing
- ☑ Athletic Shorts — 2
- ☐ Athletic Supporter
- ☑ Briefs / Boxers — 1
- ☑ Hats and Caps — 2
- ☐ Head Band
- ☐ Rain Coat / Poncho
- ☐ Shoelaces
- ☑ Shower Shoes — 1
- ☐ Slippers / House Shoes
- ☑ Socks — 2
- ☑ Sweat Pants — 2
- ☑ Sweat Shirts — 2
- ☐ Tennis Shoes:
- ☑ Thermal Tops — 2
- ☑ Thermal Bottoms — 2
- ☑ Undershirts — 5
- ☐ Wave Caps

### Female Specific
- ☐ Brassieres
- ☐ Pajama / Nightgown
- ☐ Panties
- ☐ Personal Jeans
- ☐ Robe
- ☐ Sandals:
- ☐ Scarf
- ☐ Walking Shoes:

### Personal Care/Hygiene
- ☐ After Shave
- ☑ Body Powder — 2
- ☐ Comb/Hair Pick
- ☑ Cosmetic / Shave Bag — 1
- ☐ Cotton Swabs
- ☐ Denture Adhesive
- ☐ Denture Cleanser
- ☑ Dental Flossers / Gliders — 1
- ☐ Depilatory's (Magic Shave
- ☑ Deodorant — 2
- ☐ Face Cream (Noxzema)
- ☐ Conditioner
- ☑ Hair Oil / Grease — 1
- ☐ Hair Ties
- ☐ Insect Repellant
- ☐ Laundry Detergent
- ☐ Laundry Soap Bar
- ☐ Lip Balm
- ☑ Lotions / Baby Oil — 3
- ☑ Medication /Over Counter — 12
- ☐ Mirror
- ☑ Mouth Wash — 1
- ☐ Muscle / Vapor Rub
- ☑ Nail Clipper — 1
- ☑ Palm Brush / Comb — 1
- ☐ Perm Curl / Relax Kit
- ☐ Perm Wave Kit
- ☐ Perm Wave Rods
- ☐ Petroleum Jelly
- ☐ Razors, Disposable
- ☐ Shampoo
- ☐ Shaving Cream / Gel
- ☑ Soap Bars — 12
- ☑ Soap liquid-body wash/dish — 21
- ☐ Sunblock
- ☑ Toothbrush — 3
- ☑ Toothbrush Holder — 1
- ☑ Toothpaste / Powder — 4
- ☑ Wash Cloths — 2

### Female Specific
- ☐ Bath Towel
- ☐ Blush
- ☐ Brush
- ☐ Cotton Balls
- ☐ Douche
- ☐ Emery Board
- ☐ Eyebrow Pencil / Eyeliner
- ☐ Eye Shadow Kit
- ☐ Fabric Softener
- ☐ Facial Astringent
- ☐ Facial Cleanser
- ☐ Feminine Hygiene Wash
- ☐ Foundation
- ☐ Hair Clips / Scrunchies
- ☐ Hair Sprays
- ☐ Hair Rollers
- ☐ Lip gloss / Liner / Lipstick
- ☐ Mascara
- ☐ Pumice Stone
- ☐ Shower Bag
- ☐ Shower Cap
- ☐ Shower Puffs / Loofah
- ☐ Tweezers

### Food
- ☐ Artificial Sweetener
- ☐ Beverages
- ☐ Candy: Bags ___ Bars
- ☑ Canned Food — 2
- ☑ Cereals — 4
- ☐ Cheese
- ☐ Chips / Taco Shells
- ☐ Cocoa
- ☐ Cookies
- ☐ Coffee
- ☑ Condiments — 20
- ☐ Crackers
- ☐ Creamer
- ☐ Dry Mix Drinks
- ☑ Food Pouches — 12
- ☐ Supplements
- ☑ Meals, Dry — 4
- ☐ Snack Items
- ☐ Nuts
- ☐ Peanut Butter
- ☑ Precooked Foods — 7
- ☐ Protein Supplements
- ☑ Soups / Noodles — 22
- ☐ Tea (instant or Bags)
- ☐ Vitamins
- ☐ Dried Fruit/Veg (Female)

### Miscellaneous Items
- ☐ Address Book
- ☐ Audio Cassettes
- ☐ Ballpoint Pens
- ☐ Battery Recharger
- ☑ Batteries
- ☑ Books / Magazines / Newspapers
- ☑ Bowl — 2
- ☐ Calendar
- ☐ Can Opener
- ☐ Card Stock / Drawing
- ☐ Chalk / Pastels
- ☐ Clock
- ☐ Combination Lock
- ☑ Compact Discs — 10

### (Center column top)
- ☐ Correspondence Course
- ☐ Ear Plugs
- ☐ Envelopes
- ☐ Envelopes, Metered
- ☑ Extension Cord — 1
- ☐ Greeting Cards
- ☐ Handkerchiefs/Bandannas
- ☐ Legal Material
- ☐ Legal Pads / Tablets
- ☐ Legal Size Folders Etc.
- ☐ Light Bulb
- ☐ Pencils
- ☐ Pencil Eraser
- ☐ Pencil Sharpener
- ☑ Photos, Loose — 5
- ☐ Photo Albums
- ☐ Reading Glasses (Non-prescription - magnifying glasses)
- ☐ Stamps
- ☐ Stationery
- ☑ Sun Glasses — 1
- ☑ Storage Container — 1
- ☑ Tumbler / Cups — 1
- ☐ Wallet

### Female Specific
- ☐ Antenna Wire (CIW only)
- ☐ Clothes Pins
- ☐ Eyeglass Repair Kit
- ☐ Footlocker (CIW only)
- ☐ Hangers
- ☐ Immersion Heater
- ☐ Umbrella (CIW only)

### Games
- ☐ Cards  ☐ Checkers  ☐ Chess
- ☐ Dominoes  ☐ Scrabble
- ☐ Uno (Female Only)

### Religious Items
- ☐ Altar Cloth
- ☐ Head Band Bead
- ☐ Wrist Band bead
- ☐ Choker Bead
- ☐ Beading Materials:
- ☐ Bowl/Chalice____  ☐ Chalk____
- ☐ Religious Medallion & Chain Color_____ Material_____
- ☐ Devotional Scapular
- ☐ Dream Catcher
- ☐ Feathers
- ☐ Head Gear ___  ☐ Medicine Bag
- ☐ Miswak ___  ☐ Powders ___
- ☐ Prayer Beads ☐ Prayer Oil ___
- ☐ Prayer / Holy cards / Photos___
- ☐ Prayer Rug/Mat ☐ Prayer Shawl
- ☐ Rune Tiles ☐ Sea Salt ___
- ☐ Stones___ ☐ Tutfil Katan/Tsitsit
- ☐ Tarot / Rune Cards  ☐ Wand
- ☐ Tefillin / Phylacteries ___
- ☐ Herbs:____

### Registerable Property
- ☑ Audio Entertainment Appliance
  - ☐ AM/FM ☑ CD ☐ Cassette
  - Make: AM PM
  - S/N: 5162
- ☐ Calculator:
- ☐ CD Wallet
- ☐ Ear Buds / Headphones
  - Make:
- ☐ Fan:
- ☑ Hair Clipper / Trimmer
  - ☐ A/C ☑ Battery
  - Make: Norelco
- ☐ Handicraft:
- ☑ Hot Pot: Bushy Creek
- ☐ Lamp/Book Light
  - ☐ A/C ☐ Battery
  - Make:
- ☐ Musical Instrument: ☐ String
  - Make:
  - S/N:
- ☐ Razor / Groomer
  - Make:
  - ☐ A/C ☐ Battery
- ☑ Wedding Ring — covered
  - ☑ White Metal ☐ Yellow Metal
  - Stones: ☐ Yes ☐ No
- ☑ Television: ☐ B&W ☐ Color
  - ☐ With CD player ☐ With Radio
  - Tested: ☐ Works ☐ Doesn't Work
  - Make: Clear tunes
  - S/N: N/A
- ☐ Electronic Tablet
  - Make:
  - S/N:
- ☐ MP3
  - Make:
  - S/N:
- ☐ Adapter ☐ Coaxial Cable
  - ☐ Splitter ☐ Digital Antenna
- ☐ Typewriter
  - ☐ Manual ☐ A/C ☐ Battery
  - Make:
  - S/N:
- ☑ Watch: ☑ Wrist ☐ Pocket
  - Make: Unlisted Color: Silver/brown
- ☑ Battery Charger
  - Make: AC Delco

### Female Specific
- ☐ Chain / Necklace / Bracelet
  - ☐ White Metal ☐ Yellow Metal
- ☐ Curling / Flat / Straightening Iron
  - Make:
- ☐ Earrings:
- ☐ Hair Dryer
  - Make:
- ☐ Hair Rollers
  - Make:
- ☐ Pressing Comb
  - Make:

Health Care Appliances

☐ With this signature, I agree that the above listed property is the extent of ALL my property.

Inmate Signature (upon inventory) ___ CDC # ___ Date

☐ With this signature, I am receiving the property as marked on this Inventory sheet.

Inmate Signature (upon inventory) ___ CDC # ___ Date

☐ Property Inventoried by: J. SPICER ___ 5-8-20
Staff Name (Print & Signature) ___ Date

☐ Property Received by:
Staff Name (Print & Signature) ___ Date

☐ Property Issued to Inmate by:
Staff Name (Print & Signature - upon inventory) ___ Date

### Additional Items
In the inmates
Property inventory on 4-10-20
Consolidated 5-8-20

DISTRIBUTION • Original: R&R.    Copies: Inventory Officer, Inmate, Retained in Property being Shipped/Transported