# HUNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| PEDRO JAMES WHITE, SR.,<br><br>Plaintiff,<br><br>v.<br><br>J. SANCHEZ,<br><br>Defendant. | Case No. 2:21-cv-04066-GW (DFM)<br><br>Report and Recommendation of United States Magistrate Judge |

This Report and Recommendation is submitted to the Honorable George H. Wu, United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I. INTRODUCTION

Plaintiff Pedro James White, Sr., a prisoner formerly housed at the California Men's Colony ("CMC") in San Luis Obispo, California, filed this pro se civil rights action under 42 U.S.C. § 1983.[1] See Dkt. 1. The Court previously dismissed Plaintiff's Complaint, Dkt. 1; First Amended Complaint, Dkt. 8 ("FAC"); Second Amended Complaint, Dkt. 18 ("SAC"); and Third Amended Complaint, Dkt. 54 ("TAC"), with leave to amend, see Dkts. 5, 11,

[1] As of January 7, 2024, Plaintiff was housed at California Health Care Facility in Stockton. See Dkt. 46.

43, 79. In the operative Fourth Amended Complaint, Plaintiff asserts a First Amendment retaliation claim against Defendant J. Sanchez ("Sanchez"), a correctional officer at CMC. See Dkt. 80 ("Fourth Am. Compl.").

On May 29, 2026, Defendant filed a motion for summary judgment. Dkt. 97. On July 24, 2026, Plaintiff filed an opposition, Dkt. 102, and on August 7, 2026, Defendant filed a reply, Dkt. 103. For the reasons explained below, the Court recommends that Defendant's motion for summary judgment be granted and this action be dismissed with prejudice.

## II. BACKGROUND

### A. Allegations in Fourth Amended Complaint

Plaintiff alleges that, beginning in December 2019, he filed inmate grievances, complaints, a lawsuit, and requests for outside investigation (collectively, "grievances") concerning alleged misconduct by multiple correctional officers at CMC, including Officers Reyes-Cortez, Urias, Monteiro, and Scott. Plaintiff alleges that each of those officers was a coworker or friend of Sanchez but does not allege that Sanchez knew about the grievances Plaintiff filed. See Fourth Am. Compl. ¶¶ 17-32.

Plaintiff alleges that on April 10, 2020, he observed officers using force against another inmate in the CMC dining hall and objected to their conduct. Several hours later, Plaintiff was removed from his housing unit and placed in administrative segregation for allegedly "inciting a riot." While Plaintiff was awaiting transfer to administrative segregation, Sanchez boxed Plaintiff's property and presented him with paperwork to sign. See id. ¶¶ 29-39.

Plaintiff alleges that he initially refused to sign because the document did not accurately identify his property and because Sanchez presented him with

the wrong form.[2] According to Plaintiff, Sanchez responded that Plaintiff would lose all of his property if he did not sign the form. Plaintiff alleges that he responded that he would file a grievance against Sanchez and sue him if his property were lost. Plaintiff alleges that Sanchez then left but does not allege that Sanchez made any other comment before leaving. According to Plaintiff, his property included, among other things, six boxes of legal materials concerning the grievances he had filed against the other correctional officers. See id. ¶¶ 37-40, 44-45.

Plaintiff alleges that on May 8, 2020, approximately four weeks after he was placed in administrative segregation, Sanchez visited him, told him that he had "consolidated" Plaintiff's property, and presented him with a CDCR 1083 inventory form to sign. The form, according to Plaintiff, included a box indicating whether legal materials had been confiscated, but the box was left unchecked. Plaintiff alleges that Sanchez instead identified six boxes of legal documents on separate property receipts as exceeding applicable property limits. Although Sanchez designated a disposition for the other items listed on the receipts, Plaintiff alleges that Sanchez left the disposition for the six boxes blank. According to Plaintiff, the CDCR 1083 inventory form therefore did not reflect his possession of the six boxes of legal materials, and the property receipts did not indicate how those boxes were to be handled. Plaintiff also alleges that "unlawful cell search receipts" prepared by Sanchez listed several items as "contraband" that were not. Plaintiff also alleges that Sanchez failed to list several of Plaintiff's items on the 1083. Plaintiff alleges that he refused to sign the CDCR 1083 inventory form because of these deficiencies. See id. ¶¶ 43-47.

---

[2] Plaintiff alleges that prison regulations required Sanchez to present him with a CDCR 1083 inventory form but that Sanchez presented him with a different form. Fourth Am. Compl. ¶¶ 37-38.

Plaintiff alleges that "soon thereafter," but prior to his release from administrative segregation, Sanchez destroyed his property, including the six boxes of legal materials concerning the grievances he had filed against the other correctional officers. See id. ¶¶ 45, 48.[3]

**B. Undisputed Facts**

The parties agree on the following facts.

On April 10, 2020, Plaintiff was housed at CMC and was placed in administrative segregation. See Dkt. 97-2, Def.'s Statement of Undisputed Facts ("Def.'s SUF") 1; Dkt. 102-1, Pl.'s Statement of Genuine Disputes of Material Fact ("Pl.'s SGDMF") 1; Dkt. 103-1, Def.'s Resp. to Pl.'s SGDMF 1. Sanchez was instructed by his supervisor to inventory Plaintiff's property while Plaintiff awaited placement in administrative segregation. See Def.'s SUF 2; Pl.'s SGDMF 2. Much of the property at issue consisted of paperwork stored in boxes, and Sanchez removed the boxes from Plaintiff's cell without removing the paperwork from them. See Def.'s SUF 4-5; Pl.'s SGDMF 4-5; Dkt. 97-5, Declaration of J. Sanchez ("Sanchez Decl.") ¶ 2.

Sanchez completed a CDCR Form 1083 Inmate Property Inventory, which Plaintiff signed. See Def.'s SUF 6; Pl.'s SGDMF 6.[4] On May 8, 2020, after consolidating Plaintiff's property, Sanchez visited Plaintiff, who was still in administrative segregation. See Def.'s SUF 7; Pl.'s SGDMF 7; Sanchez Decl. ¶ 4; Dkt. 102-2, Pl.'s Statement of Additional Material Facts ("Pl.'s

---

[3] Although Plaintiff alleges that Defendant Sanchez destroyed all of his property, he inconsistently alleges that some of his property was returned to him after he was released from administrative segregation. See Fourth Am. Compl. ¶ 49.

[4] Although Plaintiff alleged in the Fourth Amended Complaint that Sanchez did not present him with a CDCR Form 1083, see Fourth Am. Compl. ¶¶ 37-39, Plaintiff later declared that Sanchez did present him with the form and that he signed it under duress. See White Decl. ¶¶ 9-12.

SAMF") 18. Sanchez presented Plaintiff with another CDCR 1083 inventory form. See Sanchez Decl. ¶ 4; Pl.'s SAMF 18. A May 8, 2020 "Property Search Receipt/Notice" identifies "6 Boxes of legal Paperwork," and the disposition field for that entry is blank, although disposition codes appear for the other property identified on the notice. See Pl.'s SAMF 22; Dkt. 97-4, Declaration of I. Vazirani ("Vazirani Decl."), Ex. C.

Following his second interaction with Plaintiff concerning the property on May 8, 2020, Sanchez reported the interaction to his supervising sergeant. See Def.'s SUF 9; Pl.'s SGDMF 9; Sanchez Decl. ¶ 4. The sergeant thereafter contacted Plaintiff in administrative segregation. Sanchez had no further interactions with Plaintiff. See Def.'s SUF 9-10; Pl.'s SGDMF 10; Sanchez Decl. ¶ 4; Dkt. 97-4 at 8.

Plaintiff testified that he did not witness Sanchez destroy his property and did not know when or how the alleged destruction occurred. See Dkt. 97-4 at 8-9. When asked why he believed Sanchez destroyed the property, Plaintiff explained that Sanchez had signed the CDCR 1083 inventory form, consolidated the property, failed to give him an opportunity to select its disposition, and "was the last one to have my property." Id. at 9. When later asked whether he knew anything else about how Sanchez caused his property to be destroyed, Plaintiff answered, "No." Id. at 20. Asked whether there was "any information that [he] want[ed] to add to any of [his] answers to [the deposing attorney's] questions," Plaintiff answered, "No. Not other than [Sanchez] was supposed to give me an opportunity to send my property home or put it in [Reception and Release]. He didn't give me that opportunity." Id.

### C. Disputed Facts

The parties dispute whether Plaintiff's property was stored after Sanchez completed the initial inventory. Sanchez declares that the property was securely stored at CMC Facility C. See Def.'s SUF 6; Sanchez Decl. ¶ 3.

Plaintiff disputes Sanchez's account, contending that the six boxes were not logged or sealed as stored legal materials, that he was not provided access to them, and that no disposition for the boxes was recorded. See Pl.'s SGDMF 6; Dkt. 102-4, Declaration of Pedro White ("White Decl.") ¶ 17.

The parties also dispute what occurred on May 8, 2020, when Sanchez and Plaintiff addressed the disposition of Plaintiff's property. Sanchez states that he informed Plaintiff that the excess property could be disposed of, sent home, or stored in Reception and Release. See Def.'s SUF 8; Sanchez Decl. ¶ 4. Plaintiff denies that Sanchez offered him any disposition options or asked how he wanted the property handled. See Pl.'s SGDMF 8; White Decl. ¶ 14; Dkt. 97-4 at 9, 20. Sanchez states that Plaintiff responded "fuck you" when presented with those options, and Plaintiff denies making that statement. See Def.'s SUF 9; Pl.'s SGDMF 9; Sanchez Decl. ¶ 4; White Decl. ¶ 14.

Plaintiff maintains that, when his remaining property was reissued following his release from administrative segregation, the six boxes of legal documents were missing and never returned. See Pl.'s SAMF 25; White Decl. ¶ 18. Sanchez does not address whether the six boxes were returned but declares that he does not know what ultimately happened to Plaintiff's property. See Sanchez Decl. ¶ 5; Def.'s SUF 11.

Most significantly, the parties dispute whether Sanchez was responsible for the disappearance or destruction of the six boxes. Plaintiff contends that Sanchez destroyed the boxes. See Pl.'s SGDMF 12; Pl.'s SAMF 26; Dkt. 97-4 at 9. Sanchez denies destroying or causing the destruction of Plaintiff's property and denies acting with any retaliatory motive. See Sanchez Decl. ¶¶ 3-5.

In opposing summary judgment, Plaintiff submitted a declaration in which he alleged for the first time that Sanchez expressly referred to Plaintiff's grievances against other officers on the day his property was seized. See White

Decl. ¶ 11. According to Plaintiff, Sanchez told him that he "needed to drop the grievances and complaints" he had filed against the officers Sanchez knew and with whom he worked. Id. Later in the declaration, Plaintiff states that Sanchez "threatened to destroy my files" if he continued to file complaints against Sanchez and his colleagues. Id. ¶ 19.

## III. STANDARD OF REVIEW

A court must grant summary judgment if the papers "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a sufficient evidentiary basis exists on which a reasonable jury could find for the nonmoving party. Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Anderson, 477 U.S. at 248.

The moving party must present the basis of its motion and identify portions of the record, together with affidavits, that it believes show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party meets its burden, the opposing party must demonstrate with specific facts, not mere conclusory allegations, the existence of a genuine issue of material fact. See Anderson, 477 U.S. at 248-50, 256; Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott, 550 U.S. at 380 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (footnote omitted)). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading." Anderson, 477 U.S. at 256; see also id. at 249 (noting that "in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations . . . without any significant

probative evidence tending to support the complaint" (internal quotation marks and citation omitted)); Burchett v. Bromps, 466 F. App'x 605, 606-07 (9th Cir. 2012) (conclusory evidentiary statements unsupported by factual data do not create a triable issue of fact allowing party to survive summary judgment). Thus, summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

A court's function is "not 'to weigh the evidence and determine the truth of the matter'" but rather, after drawing all inferences in the light most favorable to the nonmoving party, to evaluate whether any genuine issue remains to be tried. Tolan v. Cotton, 572 U.S. 650, 656-57 (2014) (per curiam) (quoting Anderson, 477 U.S. at 249); see also Bonivert v. City of Clarkston, 883 F.3d 865, 880 (9th Cir. 2018) (at summary-judgment stage, courts should not weigh "conflicting evidence with respect to disputed material facts" (citation and alteration omitted)); cf. In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig., 906 F.2d 432, 441 (9th Cir. 1990) (noting that at summary-judgment stage, courts are not required to adopt unreasonable inferences from circumstantial evidence). The court may but is not required to consider materials in the record not cited by the parties. Fed. R. Civ. P. 56(c)(3).

## IV. DISCUSSION

### A. Plaintiff's Newly Asserted Statement Regarding His Prior Grievances

As noted above, in opposing summary judgment, Plaintiff relies on a statement that appears for the first time in his July 2026 declaration. Plaintiff declares that, during his April 10, 2020 interaction with Sanchez, Sanchez told him that he needed to drop the grievances and complaints he had filed against the officers Sanchez knew and with whom he worked. See White Decl. ¶ 11.

Plaintiff relies on that statement as direct evidence that Sanchez knew about the earlier grievances and acted with a retaliatory motive. See Dkt. 102 at 6-8. For the reasons explained below, the Court concludes that Plaintiff cannot rely on this newly asserted allegation to create a genuine dispute of material fact.

**1. Legal Standard**

The Ninth Circuit's sham-affidavit rule provides that a party may not create an issue of fact by submitting an affidavit that contradicts prior deposition testimony. See Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012); Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009). The rule allows a court to disregard a later-filed affidavit when the inconsistency between the affidavit and prior testimony is clear and unambiguous. See Van Asdale, 577 F.3d at 998-99. The rule does not preclude a party from elaborating upon, explaining, or clarifying prior deposition testimony, and minor inconsistencies resulting from an honest discrepancy, mistake, or newly discovered evidence do not justify disregarding a later declaration. See id. at 999 (citation omitted). Because applying the rule may require a court to disregard evidence at the summary-judgment stage, it must be applied with caution. See id. at 998 (citation omitted).

The rule is not, however, limited to direct contradictions. See Yeager, 693 F.3d at 1080-81. In Long v. Alameda Unified School District, No. 16-6279, 2018 WL 2317890 (N.D. Cal. May 22, 2018), the plaintiff was repeatedly asked why she believed a decisionmaker had acted because of her race. Id. at *5-6. She offered several reasons but omitted an alleged telephone call in which the decisionmaker allegedly used a racial epithet. See id. The district court concluded that the plaintiff's unexplained failure to mention such a significant statement when questioned about that very issue at deposition could not be dismissed as a mere omission and, thus, struck the statement pursuant to the sham-affidavit rule. See id. at *6. On appeal, the Ninth Circuit

affirmed. See Long v. Alameda Unified Sch. Dist., 764 F. App'x 585, 586 (9th Cir. 2019) (mem.).

### 2. Analysis

The Court finds that the portion of Plaintiff's declaration concerning Sanchez's purported statement about Plaintiff's grievances against other correctional officers falls within the sham-affidavit rule. When Plaintiff was directly asked at his deposition why Sanchez had retaliated against him, he made no mention of Sanchez's alleged statement directing him to drop the grievances against the other correctional officers. Instead, Plaintiff answered that Sanchez "had nepotism," that the officers "all work together," and that retaliation began after Plaintiff filed his first 602 against another officer. See Dkt. 97-4 at 9. Plaintiff was also given multiple opportunities during his deposition to disclose Sanchez's purported statement. Indeed, when asked whether there was "anything else that [was] relevant to this case" that he wanted to discuss, Plaintiff answered, "No, ma'am." Id. at 20. He likewise failed to mention Sanchez's purported statement when he was asked whether "there [was] any information that [he] want[ed] to add to any of [his] answers to [the deposing attorney's] questions." Id.

Plaintiff's deposition responses concerning his knowledge of Sanchez's relationship with the officers against whom he had filed grievances also undercut his declaration. Plaintiff was asked whether he had any knowledge about Sanchez's relationship with each of the other correctional officers against whom he filed a grievance and testified that he had no such knowledge other than that Sanchez worked with them. See id. at 10-17. Indeed, Plaintiff flatly admitted that he did not know if Sanchez knew one of the officers and based his belief that Sanchez knew another only on an "opinion" "[b]ecause all the officers are [sic] pretty much stick together." Id. at 10-12. He likewise conceded that he had never personally seen Sanchez interact with a third

correctional officer implicated in his grievances, see id. at 14, and that he knew nothing of Sanchez's relationship with a fourth correctional officer—besides that "they worked together"—or whether they, in fact, knew each other, see id. at 17. He was offered the opportunity to provide "any additional information" about Sanchez's relationship with the officers implicated in the grievances, and he repeatedly declined to provide any. See id. at 12, 15, 17. Given these responses, Plaintiff cannot rely on his later assertion that Sanchez ordered him to drop his grievances against the other correctional officers or that Sanchez threatened retaliation for refusing to drop those grievances.

The procedural history also supports application of the sham-affidavit rule. In his motion to dismiss the Third Amended Complaint, Sanchez addressed Plaintiff's allegations concerning the multiple grievances he had filed against other correctional officers and noted that Plaintiff had failed to allege that Sanchez was even aware of those grievances. See Dkt. 61-1 at 6. In response, Plaintiff did not allege that Sanchez explicitly referred to those grievances but instead argued only that it was "plausible" that Sanchez's alleged destruction of Plaintiff's property "was done in retaliation for Plaintiff's prior and then-active pursuit of the criminal prosecution of [Sanchez's] friends." Dkt. 67 at 4. In its prior Report and Recommendation, the Court specifically identified Plaintiff's failure to allege that Sanchez knew about Plaintiff's grievances against other officers. See Dkt. 73 at 6-7. Although Plaintiff objected to the Court's conclusion regarding causation, he did not identify Sanchez's alleged statement concerning the other officers. See Dkt. 76 at 2-4. Nor did he do so when given another opportunity to amend in order to state the relevant chronology "clearly and correctly." Dkt. 79 at 1 (emphasis in original); see Fourth Am. Compl. ¶¶ 36-41 (alleging that Sanchez threatened Plaintiff with the loss of his property if he did not sign the inventory form but alleging no facts concerning Sanchez's purported statement about Plaintiff's

grievances against the other officers). Plaintiff did not allege that Sanchez made any statement concerning those grievances until he opposed Sanchez's summary-judgment motion. Plaintiff offers no explanation for why he did not make that allegation in any of his complaints or mention Sanchez's purported statement at his deposition, despite being offered several opportunities to do so.

The Court therefore finds that the newly asserted allegation does not merely elaborate upon Plaintiff's earlier testimony but contradicts it. The inconsistency is clear and unambiguous and concerns the central issue of retaliatory causation. See Yeager, 693 F.3d at 1080-81; Long, 764 F. App'x at 586. Accordingly, the Court disregards the portion of Plaintiff's declaration asserting that Sanchez told Plaintiff to drop his grievances and complaints against other correctional officers.[5]

## B. First Amendment Claim

### 1. Legal Standard

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). For instance, the First Amendment "guarantees a prisoner a right to seek redress of grievances from prison authorities and as well as a right of

[5] In any event, Plaintiff's claim that Sanchez ordered him to drop his grievances against the other correctional officers rests in part on his allegation that Sanchez was personally connected to the other officers. See Fourth Am. Compl. ¶¶ 22, 27, 32. Plaintiff has presented no evidence to establish such a personal relationship, and, according to Sanchez's declaration, no such personal relationship existed. See Sanchez Decl. ¶ 6. Sanchez further declares that he did not interact with one of the officers during the relevant period and did not work with another until approximately six years after he collected Plaintiff's property. See id.

meaningful access to the courts." Jones v. Williams, 791 F.3d 1023, 1035 (9th Cir. 2015) (citation omitted). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

**2. Analysis**

Plaintiff has not presented evidence sufficient to create a genuine dispute of material fact as to several essential elements of his First Amendment retaliation claim. First, he has not presented sufficient evidence from which a reasonable juror could find that Sanchez personally destroyed, directed the destruction of, or otherwise caused the disappearance of Plaintiff's six boxes of legal materials. Plaintiff did not witness Sanchez destroy his property, does not appear to know when the boxes disappeared or were allegedly destroyed, and does not appear to know how either occurred. See Dkt. 97-4 at 8-9. When asked how Sanchez caused the property to be destroyed, Plaintiff responded only that Sanchez "was responsible for my property when he took it" and that the property was missing when Plaintiff left administrative segregation. Id. at 20. Asked whether he knew anything else about how Sanchez caused the destruction, Plaintiff answered, "No." Id.

There is, moreover, no evidence that Sanchez maintained custody of Plaintiff's legal documents after inventorying them. Rather, the record supports Sanchez's account that the documents were placed into institutional storage. The Property Search Receipt/Notice reflects that Plaintiff's six boxes of legal documents were impounded. See Vazirani Decl., Ex. C. Plaintiff also acknowledges that, on May 8, 2020, Sanchez told him that the six boxes had

been consolidated into three boxes. See White Decl. ¶ 13; Dkt. 97-4 at 9. Consistent with that account, the CDCR 1083 inventory form Sanchez prepared that day identifies three boxes among Plaintiff's inventoried property. See Vazirani Decl., Ex. D. Although Plaintiff disputes whether the boxes were thereafter stored and documented in accordance with departmental procedures, he identifies no evidence contradicting Sanchez's declaration that, after completing the inventory, he placed Plaintiff's property into institutional storage. Nor does Plaintiff's assertion that the record contains no required storage logs, without more, create a genuine dispute as to whether the boxes were stored. See Randolph v. Hall, No. 20-01434, 2024 WL 3540417, at *12 (E.D. Cal. July 25, 2024) (finding that plaintiff failed to produce evidence that prison property procedures were not followed based on the purported absence of documentary evidence and that the evidence he submitted did not support his assertion that his legal property "was not packaged and placed in a secure location").

Plaintiff likewise offers no evidence that Sanchez ever came into contact with the boxes again after May 8, 2020. Sanchez declares that, after May 8, 2020, he had no further interaction with Plaintiff or his property and does not know what ultimately happened to the property. See Sanchez Decl. ¶¶ 4-5. Plaintiff offers no evidence to contradict that account. Plaintiff also testified that he had no further contact with Sanchez after May 8, 2020. See Dkt. 97-4 at 8, 18. Although retaliation may be established through circumstantial evidence, see Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003), the circumstantial evidence Plaintiff cites does not reasonably connect Sanchez to the boxes' disappearance after he inventoried them. At bottom, Plaintiff infers that Sanchez destroyed the boxes because Sanchez collected them and cannot account for their ultimate disposition. But Sanchez has accounted for what he did with the boxes: he declares that he placed them, along with Plaintiff's other

property, into institutional storage after inventorying them. Sanchez Decl. ¶ 3. The documentary evidence is consistent with that account. See Vazirani Decl., Exs. C-D. Accordingly, a finding that Sanchez destroyed or caused the destruction of Plaintiff's legal documents would rest on speculation rather than a reasonable inference drawn from specific evidence. See Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient.").

The temporal proximity between Sanchez's alleged threat and the boxes' disappearance is also insufficient to create a triable issue of fact. Although the timing between a protected activity and an adverse action may constitute circumstantial evidence of retaliatory intent, it is insufficient on its own to do so. See Pratt v. Rowland, 65 F.3d 802, 807-08 (9th Cir. 1995); Andoe v. Kemph, 738 F. App'x 524 (9th Cir. 2018) (mem.). Here, Plaintiff has presented no evidence that Sanchez maintained or regained custody of the boxes after May 8, 2020, or otherwise participated in their later disappearance. And Sanchez declares that he did not. Moreover, Plaintiff has presented no evidence showing when the boxes disappeared. He alleges only that they were not returned to him upon his release from administrative segregation, which occurred more than two months after Sanchez purportedly threatened him with the loss of his property. See Dkt. 102 at 1-2. Thus, under these facts, temporal proximity does not create a genuine dispute of retaliatory causation. See McDowell v. Hulsey, No. 22-15266, 2022 WL 17424334, at *1 n.3 (9th Cir. Dec. 6, 2022) (temporal proximity between plaintiff's protected activity and adverse action did not by itself create a triable issue of fact when the events were separated by "several months"); Shallowhorn v. Carrillo, No. 23-2098, 2025 WL 1545684, at *4 (S.D. Cal. Apr. 9, 2025) (same when protected activity and adverse action took place over four months apart); see also Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (explaining that

timing alone does not establish a causal link between protected activity and the adverse action unless the two are "very close" and collecting cases where periods of three and four months were too long to establish the requisite link).

Second, Plaintiff has not presented sufficient evidence from which a reasonable juror could find that Sanchez took an adverse action because of Plaintiff's protected activity. At most, the evidence shows that, on April 10, 2020, Sanchez collected Plaintiff's property and told him that he would lose it if he refused to sign the property receipt. Although "the mere threat of harm can be an adverse action" for purposes of a First Amendment retaliation claim, "regardless of whether [the threat] is carried out because the threat itself can have a chilling effect," Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009), Plaintiff's own account forecloses a reasonable inference that Sanchez made the threat in retaliation for Plaintiff's protected activity. According to Plaintiff, Sanchez told him that he "would lose all of [his] property" if he "did not sign the form," and only in response did Plaintiff threaten to file a grievance and lawsuit against Sanchez if his property was destroyed. See White Decl. ¶¶ 11-12. Because Sanchez's alleged statement preceded Plaintiff's threat to file a grievance or lawsuit against him, Plaintiff's threat to do so could not have motivated Sanchez's statement.[6]

Finally, Plaintiff has not presented evidence sufficient to create a genuine dispute as to whether Sanchez's alleged threat failed to advance a legitimate correctional goal. Plaintiff's own account reflects that Sanchez warned him that he would lose his property if he refused to sign a property inventory form while he was awaiting transfer to administrative segregation. See id. ¶¶ 9-11. Plaintiff has not shown that, under those circumstances, requiring an inmate to

---

[6] As explained above, the Court does not consider the portion of Plaintiff's declaration in which he asserts that Sanchez ordered him to drop the grievances he had filed against the other correctional officers.

sign a form documenting his property and advising him of the consequences of refusing to do so fails to advance a legitimate correctional goal. See Randolph, 2024 WL 3540417, at *3 (noting that, when an inmate is placed in administrative segregation, departmental procedures require their property to be inventoried, provide that the property ordinarily will be packaged and placed in a secure location, and require use of CDCR Form 1083 to inventory the property). Although Plaintiff contends that the lack of documentation concerning the boxes' storage and ultimate disposition renders any reliance on the property-inventory process pretextual, see Dkt. 102 at 7-9 (citing Bruce, 351 F.3d at 1289; Shepard v. Quillen, 840 F.3d 686 (9th Cir. 2016)), that contention rests only on speculation. As explained above, the absence of such documentation does not, without more, permit a reasonable inference that Sanchez failed to store the documents. See Randolph, 2024 WL 3540417, at *12. Further, as noted above, Sanchez declares that the boxes were securely stored, see Sanchez Decl. ¶ 3, and the documentary evidence is consistent with Sanchez's declaration, see Vazirani Decl., Exs. C-D. Thus, on this record, Plaintiff's evidence is insufficient for a reasonable juror to conclude that Sanchez's alleged threat was unrelated to the legitimate correctional purpose of inventorying and securing Plaintiff's property pending his transfer to administrative segregation.

Put simply, Plaintiff has not presented evidence sufficient to create a genuine dispute of material fact as to several essential elements of his First Amendment retaliation claim. Accordingly, Sanchez is entitled to summary judgment on that claim.[7]

---

[7] Sanchez also argues that he is entitled to qualified immunity. See Dkt. 97-1 at 9-10. The Court need not reach that argument because, as explained above, Sanchez is entitled to summary judgment on the merits of Plaintiff's First Amendment retaliation claim.

## V. CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Judge issue an Order: (1) accepting this Report and Recommendation; (2) granting Defendant's motion for summary judgment; and (3) directing that judgment be entered dismissing this action with prejudice.

Date: October 2, 2026

DOUGLAS F. McCORMICK
United States Magistrate Judge